STATE OF CONNECTICUT *v.* ROSS BLAINE EDWARDS
(13384)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and HULL, Js.

Argued December 14, 1989—decision released February 27, 1990

*Kent Drager,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* deputy assistant state's attorney, with whom, on the brief, were *John M. Bailey,* state's attorney, and *Lawrence Daly,* assistant state's attorney, for the appellee (state).

PETERS, C. J. The dispositive issue in this appeal is the sufficiency of the evidentiary foundation for the request of a defendant, charged with having committed the crime of murder, that the jury be instructed on the lesser included nonintentional homicides of manslaughter in the first and second degrees and criminally negligent homicide. A jury found the defendant, Ross Blaine Edwards, guilty of the murder of his sister, in violation of General Statutes § 53a-54a.[1] The defendant has appealed from the judgment of the trial court sentencing him to a term of life imprisonment. We find error and remand for a new trial.

[1] General Statutes § 53a-54a provides: "MURDER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a), on the question of whether the defendant acted with intent to cause the death of another person.

"(c) Murder is punishable as a class A felony in accordance with subdivision (2) of section 53a-35a unless it is a capital felony."

The jury could reasonably have found the following facts. The defendant was living in his sister's East Hartford apartment, following his release from a New Jersey hospital after a suicide attempt. On the evening of September 17, 1986, he remained in the apartment while she went to work. After her departure, having gotten "high" on cocaine, marijuana and beer, he decided to search for his sister's gun in order to commit suicide. Ultimately successful in this search, he brought the loaded weapon into the spare room where he had been sleeping, sat down and held the gun to his chest. When his sister, upon her return from work, discovered him with the gun, she attempted to disarm him. In the ensuing struggle for the gun, she was fatally shot. After ascertaining that his sister was dead, the defendant unplugged the telephone, undertook various measures to conceal her body, and took some of her money and jewelry, including gold necklaces that she had been wearing. The next morning, he left for New Jersey, where he subsequently was apprehended, wearing her jewelry.

The East Hartford police found the victim's body on September 19, 1986, in response to a complaint from the manager of her apartment complex. The body, wrapped in a white sheet, was buried beneath various articles of clothing, bed linens and a mattress. The officers also found drug paraphernalia, a man's clothing, and papers identifying the defendant.

An autopsy of the body revealed a bullet wound to the head, the bullet entering two inches behind the left ear and exiting at the right temple area. The apparent absence of gun powder grains near the wound indicated that the gun was at least 36 inches away from the victim's head when fired, although the flow of blood

and the possible movement of the body provided an alternative explanation.[2]

At trial, the principal issue was the defendant's state of mind at the time of the shooting, because he admitted having killed his sister. He maintained, however, that he had lacked the specific intent to commit murder, because the shooting had occurred in an accidental struggle for possession of his sister's gun while he was intoxicated and suicidal. Accordingly, the defendant filed procedurally proper requests for the jury to be charged on his defense of intoxication as a defense to first degree murder and on the lesser included offenses of first degree manslaughter pursuant to General Statutes § 53a-55 (a) (3),[3] second degree manslaughter pursuant to General Statutes § 53a-56 (a) (1),[4] and criminally negligent homicide pursuant to General Statutes § 53a-58 (a).[5] The trial court gave the requested charge on intoxication as relevant to specific intent, but refused to charge on the lesser included offenses on the ground that no evidence had been presented at trial to support those charges. The jury found the defendant guilty of murder as charged.

On appeal, the defendant claims that the trial court erred in: (1) denying his request to instruct the jury on lesser included offenses; (2) denying his motions to

---

[2] In addition to the fatal shooting, there was some evidence at trial that the victim may also have been sexually assaulted.

[3] General Statutes § 53a-55 (a) provides in pertinent part: "A person is guilty of manslaughter in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person."

[4] General Statutes § 53a-56 (a) provides in relevant part: "A person is guilty of manslaughter in the second degree when: (1) He recklessly causes the death of another person . . . ."

[5] General Statutes § 53a-58 (a) provides in relevant part: "A person is guilty of criminally negligent homicide when, with criminal negligence, he causes the death of another person . . . ."

suppress evidence seized illegally; and (3) sustaining the state's objection to the testimony of a defense psychiatrist. Because we find error in the first of these trial court rulings, we will consider the others only insofar as they are likely to be implicated in a new trial.[6]

## I

We consider first whether the trial court erred in failing to instruct the jury as to the lesser, nonintentional homicides included within the crime of murder. Although the defendant sought an acquittal based on a defense of accidental death, he nonetheless requested that the jury additionally be instructed on the lesser included offenses within the crime of murder. He maintained that the jury could reasonably find that his struggle with his sister over the loaded gun amounted to criminal recklessness or negligence as prohibited by the nonintentional homicide statutes. The trial court ruled to the contrary, accepting the state's contention that, on the evidence before it, the jury could arrive at only one of two verdicts, conviction of murder as charged, or acquittal on the ground of accident. We disagree with this ruling.

The law of lesser included offenses is a common law doctrine that requires a defendant to demonstrate his compliance with the four conditions stated in *State* v. *Whistnant,* 179 Conn. 576, 588, 427 A.2d 414 (1980): "(1) an appropriate instruction is requested by either the state or the defendant; (2) it is not possible to commit the greater offense, in the manner described in the

---

[6] We need not address the third claim of error. At trial, the state objected to the presentation of testimony by the defendant's expert psychiatric witness because of the defendant's failure to give timely notice of his intent to introduce such psychiatric testimony. See Practice Book § 759. We presume that any possible prejudice that the defendant's untimely notice may originally have caused the state will have dissipated by the time of the defendant's retrial.

information or bill of particulars, without having first committed the lesser; (3) there is some evidence, introduced by either the state or the defendant, or by a combination of their proofs, which justifies conviction of the lesser offense; and (4) the proof of the element or elements which differentiate the lesser offense from the offense charged is sufficiently in dispute to permit the jury consistently to find the defendant innocent of the greater offense but guilty of the lesser." *State* v. *Herring,* 210 Conn. 78, 104–105, 554 A.2d 686, cert. denied, U.S. , 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); *State* v. *Green,* 207 Conn. 1, 11, 540 A.2d 659 (1988). The trial court expressly found that the defendant had satisfied the first two conditions of the *Whistnant* test. As to the first, his request for jury instructions on the lesser included offenses met the standards articulated by this court in *State* v. *McIntosh,* 199 Conn. 155, 158–61, 506 A.2d 104 (1986). As to the second, this court has often reaffirmed that manslaughter in the first and second degrees and criminally negligent homicide are lesser included offenses within the crime of murder. *State* v. *Herring,* supra, 105 n.25; *State* v. *Rodriguez,* 180 Conn. 382, 407, 429 A.2d 919 (1980); see General Statutes § 53a-45 (c).

The defendant has likewise complied with the fourth condition of *Whistnant,* that "the elements differentiating the lesser offense [must be] sufficiently in dispute to justify finding the defendant innocent of the greater offense but guilty of the lesser." *State* v. *Maselli,* 182 Conn. 66, 72, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981). Because the defendant admitted killing his sister, the only substantive issue before the jury was his mental state at the time of the shooting. The defendant relied on the defense of accidental death to demonstrate that he lacked the specific intent to commit murder. Lack of the requisite intent for murder, how-

ever, does not necessarily relieve the defendant of criminal culpability. Rather, specific intent provides the critical distinction between murder and the requested "lesser included homicides that require a less serious degree of culpable intent." *State* v. *Rodriguez,* supra, 405; see also *State* v. *Burge,* 195 Conn. 232, 244–45, 487 A.2d 532 (1985); *State* v. *Falby,* 187 Conn. 6, 29, 444 A.2d 213 (1982). In proffering a defense of accident to rebut his specific intent to commit murder, the defendant did not preclude a factfinder from determining that he might have had a less culpable, but still criminal, intent.

The propriety of the defendant's request for instruction on the nonintentional homicides turns, therefore, on whether the defendant has complied with the third condition of *Whistnant.* Based on the evidence before it, could the jury reasonably have found "that the defendant acted either recklessly [with or without extreme indifference to human life] or with criminal negligence in causing the victim's death . . . ?" *State* v. *Falby,* supra, 29; see *State* v. *Burge,* supra, 244. The trial court found that this condition had not been met, and the state relies on this ground in asking us to sustain the trial court's ruling. In our review, we must consider the evidence available at trial in the light most favorable to the defendant's request. *State* v. *Herring,* supra, 106. " '[T]he jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested.' *United States* v. *Comer,* 421 F.2d 1149, 1154 (D.C. Cir. 1970)." *State* v. *Manley,* 195 Conn. 567, 581, 489 A.2d 1024 (1985).

The defendant contends that there was a sufficient evidentiary foundation for his request because his struggle with his sister over a loaded gun necessarily presented a question of credibility for the jury as to

whether the resultant "accidental" death sufficiently implicated reckless or criminally negligent conduct so as to sustain his conviction on one of the less culpable homicides. The trial court's ruling to the contrary was based on its view of the case as "one of pure accident . . . [that] should go to the jury either on a guilty of murder or not guilty because of the lack of intent as claimed by the defendant."

As a general matter, we are not persuaded that a theory of "pure accident" necessarily, as a matter of law, precludes a finding of nonintentional homicide. "It is not accurate to say that a person may not be convicted of [nonintentional] manslaughter for the death of another if the death is the result of accident." *State* v. *Frost,* 342 N.W.2d 317, 323 (Minn. 1983). To assert that something is an accident does not resolve the fact-bound question of whether that "accident" was the result of criminally reckless or negligent conduct. The defendant's claim of innocence, although fashioned in terms of the defense of accidental death, "is in reality nothing more than a denial of the intent to cause serious physical injury required for conviction under General Statutes § 53a-55 (a) (1)." *State* v. *Silveira,* 198 Conn. 454, 462, 503 A.2d 599 (1986). A lack of specific intent, however, is not an available defense to a prosecution for a reckless or criminally negligent homicide because the intent to cause serious physical injury is not an element of those crimes. Id. There is thus nothing inherently inconsistent with the defendant's pressing for an acquittal based on a theory of pure accident while simultaneously requesting instructions on lesser included offenses within the crime of murder.

There is similarly no inherent inconsistency between the defendant's request for a charge on lesser included offenses and his testimony that he did not intentionally or voluntarily pull the trigger of the gun when he shot his sister. The state correctly asserts that reck-

less or criminally negligent conduct must be volitional. *State* v. *Shine,* 193 Conn. 632, 639–40, 479 A.2d 218 (1984). Nonetheless, the relevant conduct[7] that created the substantial and unjustifiable risk to the defendant's sister, is the "whole course of [his] conduct"; *State* v. *Alston,* 5 Conn. App. 571, 578, 501 A.2d 764 (1985), cert. denied, 198 Conn. 804, 503 A.2d 1186 (1986); and not just his action in pulling the trigger. See *State* v. *Knighton,* 7 Conn. App. 223, 237, 508 A.2d 772 (1986); *State* v. *Alston,* supra.

We turn then to inquire specifically into whether the evidence adduced at trial was sufficiently probative of reckless conduct to support the defendant's request for instructions on the lesser included offenses of manslaughter in the first degree as defined by § 53a-55 (a) (3) and manslaughter in the second degree as defined by § 53a-56 (a) (1). "The coupling of 'extreme indifference to human life' with recklessness is what differentiates manslaughter in the first degree from manslaughter in the second degree, as proscribed by General Statutes § 53a-56 (a) (1) . . . . " *State* v. *Shine,* supra, 639–40 n.9. Our statute defines recklessness to encompass conduct by a person "when he is aware of and consciously disregards a substantial and unjustifiable risk . . . . " General Statutes § 53a-3 (13).[8] It thus involves "a *subjective realization* of a risk and a conscious deci-

---

[7] Recognizing the difficulty in proving by direct evidence that an accused subjectively realized and chose to ignore a substantial risk, or negligently failed to perceive the risk at all, we have long held that the state of mind amounting to recklessness or criminal negligence may be inferred from conduct. See *State* v. *Bunkley,* 202 Conn. 629, 645, 572 A.2d 795 (1987); *Mooney* v. *Wabrek,* 129 Conn. 302, 308, 27 A.2d 631 (1942). It requires little extension of this principle to hold that such relevant conduct may constitute a course of behavior rather than one specific act. See *State* v. *Knighton,* 7 Conn. App. 223, 237, 508 A.2d 772 (1986); *State* v. *Alston,* 5 Conn App. 571, 578, 501 A.2d 764 (1985), cert. denied, 198 Conn. 804, 503 A.2d 1186 (1986).

[8] General Statutes 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an

sion to ignore that risk . . . ." (Emphasis in original.) *State* v. *Bunkley,* 202 Conn. 629, 643, 572 A.2d 795 (1987).

Because manslaughter by reckless conduct is a general intent crime; *State* v. *Shine,* supra, 639–40; the state contends that the lesser included manslaughter instructions would have been appropriate only if the defendant had intended to engage in the conduct that created a risk of death to his sister. The state maintains that the defendant cannot simultaneously contend that the shooting was accidental and that he acted so recklessly as to be guilty of manslaughter. We are unpersuaded. The defendant's suicidal state of mind does not preclude a finding that he subjectively realized that he was putting his sister at risk by displaying a loaded gun, but that he consciously decided not to take any precautions to avoid the risk that he had created. The accidental discharge of a weapon in such circumstances, even without the intent to achieve a wrongful purpose, may provide evidence of a lack of due care sufficient to support a finding of reckless criminal culpability.[9] Viewing the evidence, as we must,

---

offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

[9] The case law in other jurisdictions supports this conclusion. See, e.g., *State* v. *Frost,* 342 N.W.2d 317, 320 (Minn. 1983) (struggle with loaded gun that unintentionally discharged sufficient to support conviction of nonintentional manslaughter); *State* v. *Stimpson,* 279 N.C. 716, 724, 185 S.E.2d 168 (1971) (defendant's testimony that discharge was accidental was sufficient basis for jury instruction on involuntary manslaughter); *Withers* v. *State,* 631 S.W.2d 595, 597 (Tex. App. 1982) (defendant's conduct sufficiently voluntary to be criminally negligent where he loaded gun and pushed dog out of his lap, causing unintentional discharge). We disagree with the state's contention that these cases are distinguishable because they involve gun accidents in which the gun was not directed at the defendant himself but at a third party. All the cases, including the present one, demonstrate that recklessness can be inferred because pointing a loaded weapon at anyone inherently creates a risk of death.

most favorably to sustaining the lesser included offenses of reckless manslaughter, we conclude that the jury could reasonably have found that the defendant, having used various intoxicants, loaded a gun and aimed it at his chest with the intention of committing suicide, that upon his sister's sudden and unexpected appearance, she grabbed for the gun, that the defendant then decided to engage in a struggle over the gun, consciously ignoring the inherent and unintended risks that a loaded weapon presented for his sister, and that such conduct constituted recklessness that is criminally cognizable as manslaughter in either the first or second degrees.[10]

This reasonable factual supposition applies with equal force to sustain a jury instruction on the lesser included offense of criminally negligent homicide as defined by § 53a-58 (a). "Criminal negligence" has been statutorily defined as action taken when a person "fails to perceive a substantial and unjustifiable risk . . . ." General Statutes § 53a-3 (14).[11] In the circumstances of this case, the same evidence that demonstrates "recklessness" also demonstrates a "failure to perceive a substantial and unjustifiable risk." If, indeed, the state's emphasis on the defendant's suicidal intention proves significant to a jury, a verdict of criminally negligent

---

[10] Having found error in the trial court's refusal to charge as requested, we need not consider the defendant's alternate claim that his use of intoxicants constituted sufficient evidence to support instruction on the lesser included, nonintentional homicides. As the state correctly notes, this issue is not reviewable, absent plain error, because the defendant failed to raise it in his request to charge. *State* v. *Herring,* 210 Conn. 78, 105, 554 A.2d 686, cert. denied,    U.S.    , 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989).

[11] General Statutes § 53a-3 (14) provides: "A person acts with 'criminal negligence' with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

homicide might be the more appropriate verdict. A jury could infer that the defendant's preoccupation with ending his own life caused him to fail to perceive the risk to others created by his possession of a loaded gun and his volitional struggle to retain it.

Because the defendant had complied with each condition of the *Whistant* test for instructions on lesser included offenses, the trial court erred in denying the defendant's requests to charge the jury that it could consider convicting him of reckless or criminally negligent homicide rather than of murder. This error entitles the defendant to a new trial.

## II

We turn now to the validity of the trial court's denials of the defendant's motions to suppress evidence because the issues raised thereby are likely to recur at the defendant's retrial. These motions concern three warrantless searches and seizures. The first search and seizure was of the defendant himself at his temporary residence. The second and third searches occurred within his temporary residence, with the consent of its lessee, and resulted in the seizure of a .38 caliber shell and of the defendant's backpack. At least on the grounds asserted at trial, we find error with respect to the defendant's seizure, no error in the seizure of the shell, and error in the seizure of the backpack.

## A

The defendant first contends that the trial court erred, as a matter of law, in concluding that the "stop and frisk" doctrine of *Terry* v. *Ohio,* 392 U.S. 1, 27–31, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), justified his warrantless seizure, his transfer to and his detention at police headquarters. He contends that he was illegally seized and that the trial court was required to sup-

press the fruits of his illegal seizure. On the record presently before us, we agree with the defendant.

The facts underlying this claim of error are not in dispute. A few days after the discovery of the victim's body, two East Hartford detectives went to New Jersey to interview her mother and her half-brother, Ralph Sparks. From these interviews, the detectives learned that the victim had a strong attachment to certain gold jewelry that she rarely removed from her person. Sparks further told them that the defendant had been seen in Newark wearing gold jewelry allegedly belonging to the victim. After an unsuccessful search for the defendant, the detectives returned to Connecticut. In the meantime, the East Hartford police department had issued a teletype on the National Computer Information System on September 20, 1986, notifying police agencies throughout the country that the defendant was *"wanted for questioning only* in connection with a homicide investigation . . . ." (Emphasis added.)

On September 22, 1986, the Newark police department dispatched two officers to an address in Newark to contact Sparks in reference to a homicide. Sparks told the officers that the defendant resided at that address and that the defendant had killed his sister and had stolen her jewelry. The officers, accompanied by Sparks and his girlfriend, went at Sparks' direction to a third floor apartment and knocked. When the lessee of the apartment opened the door, the defendant walked into plain view. Sparks and his girlfriend identified the defendant as well as the jewelry that the defendant wore around his neck. One of the officers then placed the defendant in handcuffs, explaining that he was not under arrest but rather was being transported to police headquarters for questioning in reference to a homicide investigation.

At headquarters, the officer turned the defendant over to a detective who, after identifying himself, advised the defendant of his *Miranda* rights, reiterated that he was not under arrest but acknowledged that he was not free to leave. The detective did not question the defendant, but indicated that he was being held for questioning by the East Hartford police department, which was being notified of his detention. At this time, the police officer seized from the defendant the jewelry that allegedly had belonged to his sister. Thereafter, on the basis of a further conversation with the East Hartford authorities,[12] the detective arrested the defendant for possession of stolen property. Upon their arrival the next morning, the East Hartford detectives interviewed the defendant, who had been held in a cell overnight. After waiving his *Miranda* rights, the defendant proceeded to give statements to these officers concerning his role in the victim's death.

"[C]ertain seizures are justifiable under the Fourth Amendment even in the absence of probable cause 'if there is articulable suspicion that a person *has committed* or is about to commit a crime.' [*Florida* v. *Royer,* 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983)] (plurality opinion) (emphasis added)." *United States* v. *Hensley,* 469 U.S. 221, 227, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985). "One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. . . . Determination of the means that are reasonably necessary to maintain the status quo necessarily depends upon a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal

[12] The New Jersey detective mistakenly understood that the East Hartford police had procured a warrant for the defendant's arrest. In fact, although a proper application had been made, the warrant was not signed by a judge until the following day.

security of a suspect. *Michigan* v. *Long,* 463 U.S. 1032, 1051, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983); *United States* v. *Place,* 462 U.S. 696, 704–705, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *Florida* v. *Royer,* supra, 499–500 . . . ." *State* v. *Braxton,* 196 Conn. 685, 689–90, 495 A.2d 273 (1985).

The defendant does not contest that the New Jersey police had a reasonable and articulable suspicion that justified detaining him briefly. He claims, however, that the constitutionally permissible scope of a *Terry* stop detention was exceeded in this case when the police transported him, in handcuffs, to a police station to be held there for interstate investigative purposes for an indefinite period of time. This precise claim of error presents a question of first impression for this court.

"A *Terry* stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. See *United States* v. *Sharpe,* 470 U.S. 675, 684, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *Florida* v. *Royer,* [supra, 500]." *State* v. *Mitchell,* 204 Conn. 187, 197, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). In *Hayes* v. *Florida,* 470 U.S. 811, 105 S. Ct. 1643, 84 L. Ed. 2d 705 (1985), the United States Supreme Court applied this standard to facts remarkably close to ours. The court held: "There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. . . . [O]ur view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station,

where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures . . . are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause." Id., 815–16.

*Hayes* v. *Florida* compels the conclusion that the police exceeded the permissible bounds of a *Terry* stop in this case. Although any inquiry into *Terry* boundaries is necessarily fact-bound; *State* v. *Mitchell,* supra; *State* v. *Aillon,* 202 Conn. 385, 401, 521 A.2d 555 (1987); *State* v. *Braxton,* supra, 689–90; our case law has similarly emphasized the geographical boundaries of a permissible *Terry* stop. We have found no constitutional infirmity in requiring a suspect to accompany the police to a hospital to be viewed by the victim of a crime; *State* v. *Mitchell,* supra, 199; but we have never extended a *Terry* stop to include transporting a suspect to a police station for open ended questioning. We decline to do so in the circumstances of this case.[13] Even in the pursuit of criminal behavior that occurred in another state, the police must either abide by the limitations that inhere in *Terry* stops or must make a showing of probable cause to arrest.[14]

---

[13] We decline, in the circumstances of this case, to follow the authorities cited by the state that hold that a suspect who has been lawfully detained may lawfully be transported to police headquarters. See *United States* v. *Perez-Esparza,* 609 F.2d 1284, 1287 n.2 (9th Cir. 1979); *United States* v. *O'Looney,* 544 F.2d 385, 389–90 (9th Cir.), cert. denied, 429 U.S. 1023, 97 S. Ct. 642, 50 L. Ed. 2d 625 (1976); *People* v. *Courtney,* 11 Cal. App. 3d 1185, 1192, 90 Cal. Rptr. 370 (1970); *People* v. *White,* 134 Ill. App. 3d 262, 285–87, 479 N.E.2d 1121 (1985), cert. denied, 475 U.S. 1126, 106 S. Ct. 1650, 90 L. Ed. 2d 194 (1986).

[14] The state asserts, in the alternative, that the seizure of the defendant at his temporary residence was supported by probable cause and that the exigent circumstances created by the interstate nature of a Connecticut homicide and a New Jersey seizure justified his subsequent warrantless detention at Newark police headquarters. In the absence of a trial court ruling on probable cause, we express no view on the merits of the state's position. The state is free to explore this matter further in preparation for the retrial.

We therefore conclude that the trial court erred in sustaining the legality of the defendant's seizure under the *Terry* stop doctrine. As a consequence, unless some other basis for admissibility is established at retrial, the defendant is entitled to the suppression of the jewelry taken from him at the time of his detention and the statement taken from him at the police station.[15]

B

We turn finally to the validity of the warrantless search of the apartment which was the defendant's temporary residence. That search, with the consent of its lessee, led to the seizure of a .38 caliber shell casing from a potato chip box and the defendant's backpack.

The defendant cannot prevail in his objection to the seizure of the shell. While the defendant, as an invited guest residing even temporarily in a private residence, may have had a reasonable expectation of privacy in the premises; *Rakas* v. *Illinois,* 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978), reh. denied, 439 U.S. 1122, 99 S. Ct. 1035, 59 L. Ed. 2d 83 (1979); *Stoner* v. *California,* 376 U.S. 483, 490, 84 S. Ct. 889, 11 L. Ed. 2d 856, reh. denied, 377 U.S. 940, 84 S. Ct. 1330, 12 L. Ed. 2d 303 (1964); *United States* v. *Echegoyen,* 799 F.2d 1271, 1277 (9th Cir. 1986); *United States* v. *Lyons,* 706 F.2d 321, 327 (D.C. Cir. 1983); *State* v. *Reddick,* 207 Conn. 323, 330, 541 A.2d 1209 (1988); the lessee clearly had the authority to consent to the search

---

[15] Even if the state cannot establish probable cause, it will have the opportunity, at the defendant's retrial, to persuade the trial court that the defendant's confession was a voluntary statement that would be admissible because it was sufficiently removed in time and circumstance from the wrongful conduct involved in the defendant's protracted seizure. See *Dunaway* v. *New York,* 442 U.S. 200, 216–19, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown* v. *Illinois,* 422 U.S. 590, 603–604, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

of her apartment. "In order for third-party consent to be valid, the consenting party must have 'possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.' *United States* v. *Matlock,* 415 U.S. 164, 171, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974) . . . ." *State* v. *Jones,* 193 Conn. 70, 80, 475 A.2d 1087 (1984). A police officer testified to the lessee's consent to the search. Moreover, the defendant did not have a reasonable expectation of privacy, in his temporary residence, to an item found in a food container to which any occupant of the apartment had ready access. Accordingly, we find no error with respect to this particular denial of a motion to suppress.

The defendant stands on a different footing, however, with regard to the search of his backpack. Although it is sufficiently clear that the lessee consented to the search of the apartment with the authority to do so, as lessee she did not possess the authority lawfully to consent to the search of her guest's personal effects. "The law obviously does not insist that a person assertively clutch an object in order to retain the protection of the fourth amendment." *United States* v. *Thomas,* 864 F.2d 843, 846 (D.C. Cir. 1989). The defendant, as a person, who resides at a private residence with permission of the lessee as a guest; *State* v. *Reddick,* supra, 329–30; had a justifiable expectation that his personal effects, including the backpack, would remain private. Id.

"This justifiable expectation should not be vitiated by a strained application of the third-party consent doctrine; the consent of the host should ordinarily be insufficient to justify a warrantless search when it is obvious that the searched item is the exclusive property of the guest." *United States* v. *Isom,* 588 F.2d 858, 861 (2d Cir. 1978). As "a common repository for one's personal effects, and therefore . . . inevitably

associated with the expectation of privacy"; *Arkansas v. Sanders,* 442 U.S. 753, 762, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979); luggage may be lawfully searched, in general, only pursuant to a warrant. Id., 763. We can discern no intrinsic constitutional distinction between a backpack and luggage. *United States* v. *Meier,* 602 F.2d 253, 255 (10th Cir. 1979).

The state maintains, nonetheless, that, in the particular circumstances of this case, the lessee's consent to the search validated the seizure of the defendant's backpack. The state calls our attention to the fact that the defendant left his backpack, unlocked, at his temporary residence. We are not persuaded that these circumstances authorized the seizure in this case. Although there might have been a clearer expectation of privacy in a backpack that was locked; *United States* v. *Isom,* supra, 861; we agree with the holding of *United States* v. *Most,* 876 F.2d 191, 197–98 (D.C. Cir. 1989), that such a security measure is not essential to the defendant's fourth amendment rights. Furthermore, the defendant did not expressly or impliedly give the lessee access to the backpack merely by leaving it in the apartment. Unlike *Frazier* v. *Cupp,* 394 U.S. 731, 740, 89 S. Ct. 1420, 22 L. Ed. 2d 684 (1969), on which the state relies, there is no evidence that the defendant in this case ever authorized the lessee to inspect the contents of his backpack.

We therefore conclude that the lessee's consent did not validate the warrantless search of the defendant's backpack. The trial court, accordingly, should have granted the defendant's motion to suppress the evidence thereby seized. As a consequence, the defendant is entitled upon retrial to the suppression of that jewelry and the set of keys to the victim's apartment

that were illegally seized from his backpack, unless the state adduces an alternate, legitimate ground for their seizure.

There is error, the judgment is set aside and the case is remanded for a new trial.

In this opinion the other justices concurred.