[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO SUPPRESS
The cases of the two co-defendants, named above, have been combined for a hearing on motions to suppress filed by each defendant's attorney. Each defendant is facing one file containing robbery-related charges and one file containing murder-related charges. The charges arise out of two separate incidents, which allegedly occurred on the same day, viz: June 14, 1994.
The motions filed by Ms. Casey's lawyer are dated September 26, 1994, and the motions filed by Mr. Ross' attorney are dated December 15, 1994. However, in advance of the hearing, both attorneys agreed to adopt the motions filed by the other attorney. In addition, the attorneys agreed to separate the two main legal issues and each would brief only one main issue (and related sub-issues). At the start of the hearing, the lawyers adopted each other's brief and, at the end of the hearing, each other's closing arguments.
The legal issues have been properly raised by both defendants. Both defense attorneys have done an outstanding job, in a very professional manner. The hearing lasted four days, during which evidence was presented by the state and vigorously challenged by the defense attorneys. The cross-examination of each witness was thorough, to say the least.
Both defense attorneys have raised very serious legal and constitutional issues regarding the investigatory stop (so-called "Terry" Stop[1]) and identification process. Both argued that if the stop or identification process is tainted, then all subsequent; evidence seized, should be suppressed, under the theory that the evidence so seized represented the "fruits of the poisonous tree."
The stop which took place, and the subsequent identification process was without a warrant. The burden of proving, by a fair preponderance of the evidence, that the stop, subsequent arrest and seizure process was valid lies with the State. The State's Attorney in this case thoroughly and methodically presented evidence to support the state's theory of the case. The State's position is that the "Terry" stop was legal and that no arrest occurred until after the identification process. The State further claims that although the defendants were clearly restricted and CT Page 173 unable to leave, this was necessary to safely complete the investigatory stop.
Concerning the issue of the identification process, the defendant "bears the initial burden of proving that the identification resulted from an unconstitutional procedure." Statev. Hinton, 196 Conn. 289, 293 (1985). Furthermore, "the defendant must prove (1) that the identification procedures were unnecessarily suggestive, and (2) that the resulting identification was not reliable in the totality of the circumstances." State v.Collette, 199 Conn. 308, 310 (1986). If the defendant establishes both prongs of this test, then the burden of persuasion shifts to the prosecution. In that event, the prosecution must establish a witness' independent recollection for an in-court identification by "clear and convincing evidence." State v. Lee, 177 Conn. 335, 340
(1979). Despite the burden of proof lying with the defendant, the state took the initiative to present evidence related to the issues of whether or not the identification procedure was "unnecessarily" suggestive, and, if so, whether or not it was reliable, in spite of the "impermissible" suggestiveness.
STIPULATIONS
There were two stipulations entered into by the State and the defendants, through their attorneys.
The first stipulation was that the South Windsor and Vernon police officers (collectively) had sufficient information to make a "Terry" stop of the car driven by Mr. Ross. This stipulation was clearly supported by the facts elicited at the hearing.
The second stipulation was that the State concedes that up to the point of the identification, there was no probable cause for arrest. This stipulation was, likewise, clearly supported by the evidence presented at the hearing.
FACTS
On June 14, 1994 in Vernon, Connecticut two crimes allegedly took place, which might have had some connection. The first was an alleged Robbery at the corner of Union and Ward Streets in the parking lot of the X-tra Mart. The alleged victim was Benny Cruz. The alleged perpetrator was a black female with two or more black male companions. A small caliber black handgun was allegedly used. The alleged perpetrators were riding in a turquoise car (a Pontiac CT Page 174 Grand AM, or Chevrolet Beretta).
Later the same day, at 104 Talcott Avenue in Vernon, a young man named Joseph Michaud, was shot (and he later died) allegedly by a black female (accompanied by two black males) using a small caliber handgun. No witnesses at the hearing testified about the car in which they left.
The Vernon police were called, and responded promptly. The police immediately discovered, that Mr. Michaud's injuries were life-threatening. They also found that there was a large crowd at 104 Talcott Avenue. This presented immediate crowd control concerns. In addition, the Life Star helicopter was en route, and was set to land nearby, at the corner of Ellington Avenue and Prospect Street. This further exasperated the crowd control problems. Finally, the police had been notified that a large crowd of angry youths had gathered at the corner of Union and Ward Streets, by the X-tra Mart. That situation also required immediate police attention.
A Vernon police officer, Sergeant Richard Simon took charge of the crime scene at 104 Talcott Avenue, and assigned officers to different locations. He also assigned Detective Zamichiei to take statements from witnesses at the scene (on Talcott Ave.). At some point, Detective Zamichiei talked to a young woman, Lauren Vitale. It seems that Ms. Vitale was in the same room with Joseph Michaud, when he was shot. Ms. Vitale claimed she had seen the alleged "shooter" (a black woman) and her two black male companions.
In a very short time, Vernon police officers were receiving bits and pieces of information, that could be helpful in the early stages of the investigation. Some of this information related to the earlier alleged robbery of Benny Cruz and the apparent similarities between the description of the alleged perpetrators of that crime and the alleged perpetrators in the Michaud case. There was also information about a black female in a Ford LTD, seen earlier in the afternoon at 104 Talcott Ave. (This later proved to be unrelated to the shooting).
In an effort to try to get the jump on the alleged perpetrators, a description of a turquoise car, with three black males, or two black males and one black female was put out over a regional police network. Soon, the South Windsor police were told that the suspect car was at the Getty gas station on Sullivan Avenue in South Windsor. Officers Russotto and Riggs ultimately CT Page 175 ended up following the suspect vehicle, westbound on Sullivan; Avenue. The suspect vehicle turned left and started southbound on John Fitch Boulevard (Route 5 South). Officer Russotto immediately signalled to get the driver of the turquoise car to pull over to the right lane and stop. Officer Riggs was behind Office Russotto.
The suspect car stopped without incident. Riggs and Russotto had their cars behind the car driven my Mr. Ross. Riggs and Russotto waited a few moments for Sergeant Ritter (and other officers) to arrive. These officers utilized the South Windsor Felony Car Stop (High Risk) procedures. The officers were very, concerned because they believed one occupant in the car might have been involved in a shooting. The police proceeded very cautiously and the suspects were totally cooperative.
After rerouting traffic (Route 5 traffic, both northbound and southbound, would be quite heavy on a weekday, between 5:00 p. m. and 6:00 p. m.), the South Windsor police officers ordered one occupant at a time out of the vehicle. The police used a public address system, built into the cruiser. Other officers were the "cover officers", with weapons drawn and aimed toward the occupants of the suspect vehicle. One officer claimed he had a shotgun, pointing skyward, with the safety "on". That one piece of testimony was out of character with the rest of the testimony, that indicated that the occupants were very carefully "covered".
Each occupant was asked to back up, turn around, and keep their hands raised. Then each occupant was told to kneel, with his or her back to the officers, and each occupant was then handcuffed and "frisked" for weapons. (The notable exception was the right-front passenger Ebony Casey, who was not "frisked", because she is a female, and there were no female police officers at the scene). Thereafter, the occupants, handcuffed, were placed in two different police cruisers (two in each car).
The officers then did a cursory search of the car, to look for weapons (particularly, a gun). At this point, there was concededly no probable cause to arrest. Therefore, no search, incident to arrest, could be completed. However, a weapons search, for the safety of the officers and the general public is permissible.[2]
A knife was found, but no gun. Officer Martin, being concerned that a gun might still be in the car, did a second search of the car, but still found no gun. However, he did find what appeared to be a .22 cal. shell casing (spent) in the open plastic CT Page 176 molded pocket, in the door on the passengers' side of the car. That was where MS. Casey had been sitting. He then did a second "pat down" of the three male occupants, but found no gun. He reported his finding to the other officers, including Sergeant Ritter.
Throughout this process, Sgt. Ritter had notified Vernon Police that they had stopped a car matching the description that had been broadcast. Since this was an investigatory stop, the purpose was to ascertain, as quickly as possible, if these occupants were the alleged perpetrators of the Vernon shooting. If not, they should be allowed to leave, as soon as possible. In fact, Sgt. Ritter testified that if Vernon was not going to bring witnesses to South Windsor, he would have taken identifications and allowed the four occupants to leave. Therefore, he checked through the South Windsor dispatcher, and was told that Vernon was on the way.
The timing of things is a little difficult to follow, because there were transmissions back and forth between, Vernon, South Windsor, East Hartford and the Connecticut State Police in Hartford. It appears South Windsor first got the bulletin at 5:37 p. m. The stop was made on Route 5 at approximately 5:41 p. m. There were several conversations back and forth until approximately 5:51 p. m., wherein South Windsor was trying to get additional details for identification purposes. Unfortunately, since both South Windsor and Vernon officers were communicating through their respective dispatchers, and since Vernon was getting bits and pieces of information, some was correct and some was not. All this caused a delay of about ten minutes. At 5:51 p. m., South Windsor asked Vernon to send some witnesses to make an identification, if they could. South Windsor was given a second verification that Vernon was on the way to South Windsor at 5:57 p. m. At that point South Windsor also started to run record checks on the four occupants.[3]
The record checks came up "clean" for no "wants or warrants." By now, South Windsor knew Vernon was on route with witnesses.
At the Vernon end, they were asked to come to South Windsor at 5:52 p. m. By that time, there were potential witnesses at 104 Talcott Avenue and others at the X-tra Mart at Ward and Union Streets. They also had a potential fight developing, involving 20 or 25 youths (with possible weapons), at the X-tra Mart. Sgt. Simon (VPD) wanted to coordinate the identification process, so he CT Page 177 told Officer Meyers to round up his witnesses and to bring them to Talcott Avenue, so they could all go to South Windsor together (in two cars).
It took approximately six or seven minutes for them to coordinate at Talcott Avenue. They then took approximately 20-25
minutes to get to Route 5 in South Windsor where the suspect car was stopped. Most of Vernon's street cruisers were engaged in this operation, in one phase or another. Vernon had put out a call to off duty officers to come in for overtime duty.
In South Windsor, five of six patrol cars on this shift were occupied at the Route 5 stop. In fact, one officer had to leave the Route 5 location, when the situation was stabilized to complete an accident investigation on Sullivan Avenue.
The Vernon officers acted very professionally and made some quick, intuitive decisions, while facing a very chaotic situation. They also were aware of potential gang violence, in retaliation for the shooting of Joseph Michaud. Under all the circumstances, they moved relatively promptly, in an orderly manner.
When the Vernon officers arrived at Route 5, they stopped the car approximately 100-150 yards north of the spot where the four occupants and the turquoise car were stopped. Sgt. Simon walked down to meet with Sgt. Ritter, to coordinate the identification process. The Vernon officers told the witnesses, that they could not discuss the identification process amongst themselves, either before or after they actually participated.
The four occupants were standing on the grass, west of the shoulder of southbound Route 5. They all had their hands behind their backs, since they were handcuffed. Each witness, except one, testified that they were not aware of the handcuffs at the time.
Each witness was taken alone, in Sgt. Minor's car, to a point approximately fifty feet from the four occupants. (Lauren Vitale's mother was in the car with her, but the mother was not a witness). Most of the witnesses asked to have something to cover their heads, so they could not be seen by the four occupants. Lauren Vitale was first and she made a positive identification of Ebony Casey, as the girl she saw earlier, outside Joe Michaud's window, just before Mr. Michaud was shot. She also identified Mr. Ross as being another person she had seen on the porch, outside Michaud's window, just before Michaud was shot. CT Page 178
The identification process continued, one witness at a time. Some witnesses identified one or more persons, and some identified none. Some identified the car, too. When the process was completed (it took about 20-25 minutes) all four occupants were identified as having been involved in the Talcott Ave. shooting, the earlier robbery of Benny Cruz, or the inquiry on Village Street that preceded the Cruz robbery. The arrests took place at 7:06 p. m.
The initial attainment of probable cause for arrest of Ebony Casey and Edwin Ross was when Lauren Vitale made her identifications at approximately 6:45 p. m. Although this type of identification process is clearly suggestive, the Court finds that the identifications were emphatic and unaffected by the surrounding circumstances. Lauren Vitale's identification was uttered spontaneously, even before the car stopped at the prearranged point. She was, in her words, "200%" certain of her identification. She did not hesitate. She asked to have the suspects turn around, so she could see the writing on the back of Ms. Casey's shirt, to verify her identification. This proved that there was lettering on the back of the shirt, as Ms. Vitale had indicated before she viewed the back of Ms. Casey's shirt (at the Route 5 location). She was unable to make a positive identification of one of the juveniles, and she so stated. She recognized Ross primarily by his clothing, and she so testified.
The Court feels that the identifications by all the witnesses, are reliable, in spite of the suggestive nature of the process.
The Court finds that the testimony of Sgt. Ritter of South Windsor was credible and established a valid basis for the extent of restraint that was utilized. He testified that as he heard various reports from Vernon, some of it was consistent with the four people who had been stopped, and some was inconsistent. However, he knew he was hearing bits and pieces of information, some of which might not have been verified. He also felt that there were enough factors, to support his belief that they had the alleged perpetrators.
He knew this was only an investigatory stop. He testified that if Vernon was not going to bring witnesses to South Windsor, he was going to get identifications and let the four occupants go. But, he still felt that he had the correct suspects. Therefore, he verified that Vernon was on the way to South Windsor. CT Page 179
Once he made the decision to hold them for Vernon, he had to be concerned about safety of his officers, potential escape, and safety of the public. He was aware that he had nearly his entire shift at the scene. He did have two East Hartford officers show up, but he felt they were "curiosity seekers" and he did not want to start using strangers in this operation.
He knew there had been a gun used in Vernon. He also knew that no gun was found in the car, or on the person of the occupants, based upon the cursory "car search" and "pat down" of three of the occupants. He also knew the fourth occupant was only subjected to a visual search, because she was a female, and no female officers were present. He also believed that the female might have been the actual shooter. He had a serious traffic control problem, because they were on Route 5, which is a very busy road in South Windsor.
He testified that he was concerned that one of the occupants might have had the gun. He also testified that the cruisers were left running, because it was hot, and they had to keep the air conditioning running in the cars. He felt that if he removed the handcuffs, the suspects might have pulled off the security grate, and gotten into the front seat of the police cars, where they could have driven off. He was also concerned that if one of the suspects tried to run, someone could have been hurt.
Under all the circumstances, the Court finds Sgt. Ritter's decision to keep the four occupants handcuffed, locked in the back of police cruisers, and later handcuffed during the identification process was a reasonable judgment call. His main concern was safety, and the steps taken were reasonable under the circumstances. The key question is whether those decisions pass constitutional scrutiny.
ISSUES
The two main issues are as follows:
 1. Whether or not an "arrest" took place before the "identification process", when concededly there was not probable cause for an arrest. If an arrest did take place before the identification process, the defendant claims that all evidence seized, incident to that arrest, should be suppressed (together with the "fruits of the CT Page 180 poisonous tree").
 2. Whether or not the identification process was impermissibly suggestive, so as to invalidate the identification of the defendants. If the identification was so tainted, that it must be invalidated, then the subsequent arrest, based on those identifications must be invalidated, as well.
LAW (Issue #1)
The first issue which the defendants raise by their motions to suppress is whether an arrest occurred before the police had probable cause. If that were the case, the defendants argue that anything seized before probable cause attached, must be suppressed. Furthermore, the defendants argue that any other evidence that is linked to the improperly seized evidence, should also be suppressed as being the "fruits of the poisonous tree."
Initially, however, the defendants must have standing to raise these issues. "`A person may not object to the introduction of evidence resulting from an illegal search unless [the defendant] first proves that he was the victim of that search . . . . One is a victim of a search when it violates his reasonable expectation of privacy in the area searched . . . . Therefore, the first question that must be answered in any suppression case is whether the individual who seeks suppression had a reasonable expectation of privacy in the area to be searched.' (Citations omitted). An individual has a reasonable expectation of privacy if he subjectively believes that the area will remain private, and that belief is one that society is willing to recognize as reasonable . . . ." State v. Burns, 23 Conn. App. 602, 611 (1990).
In the case of the defendant Edwin Ross, he would have standing to attack the seizure of evidence from the car which he was driving. The Court has taken Judicial Notice of a search warrant in this case which indicates that the owner of the car, had given Mr. Ross permission to use the car. He did not, however, have a possessory interest, or a reasonable expectation of privacy in the area in and around 104 Talcott Avenue, or on the area adjacent to Sullivan Avenue in South Windsor where a gun was found. (Location noted on State's Exhibit "A," which is different than the location noted in page 30 of the State's brief. The Court assumes, Exhibit "A" is accurate.). Therefore, he lacked the requisite standing to challenge evidence seized at those two locations. CT Page 181State v. Manson, 13 Conn. App. 220, 222 (1988).
The defendant, Ebony Casey, likewise had no possessory interest or reasonable expectation of privacy in the area around 104 Talcott Avenue, or the grassy area adjacent to Sullivan Avenue. Furthermore, she had no possessory interest, or reasonable expectation of privacy, in the automobile in which she was a passenger. Id. at 223. Therefore, she has no standing to challenge the admission of the evidence seized from those three locations.
Even assuming, however, that both defendants do have standing, the decision of this Court, set forth below, renders the "standing" issue moot.
The defendants claim that all evidence seized represents tainted fruit of an illegal arrest which, therefore, should be suppressed. Wong Sun v. United States, 371 U.S. 471, 484-86
(1963). The defendants claim that an "arrest" took place shortly after their car was stopped because they were: (1) ordered out of, the car, one at a time, (2) they were told to raise their hands and back toward the police officers, (3) they were handcuffed and "frisked", (4) they were detained for nearly one hour until the subsequent identification process began, (5) they were held in the back of police cruisers with no door handles, (6) one of the passengers, a juvenile, was given a partial advisement of his rights, and (7) they clearly were not free to leave.
The Court finds that the defendants met their initial burden that this was a warrantless arrest therefore, the burden of proof (by a preponderance of the evidence) shifts to the state to establish an exception to the warrant requirement. The state claims that the initial stop was a valid "Terry" stop. Terry v.Ohio, supra, 392 U.S. 1. The defendants stipulated that the South Windsor and Vernon police officers collectively had sufficient information to make a "Terry" stop of the automobile, in which the defendants were riding.
The state stipulated that there was no probable cause for arrest between the initial "Terry" stop and the time of the identifications of the defendants. The pivotal question is whether or not the South Windsor officers exceeded the proper scope of an investigatory stop by restraining the suspects as they did. A secondary question is whether the "frisks" of the defendant Ross and the two juveniles, or the initial searches of the car exceeded CT Page 182 the allowable procedures under Terry.
The short answer to both questions is: "no."
By stipulating to the fact that the state had sufficient information to make a Terry stop, the defendants are conceding that the police had reasonable and articulable suspicion that the defendants were engaged in criminal activity. State v. Halloman,20 Conn. App. 521, 524 (1990). Even if the stipulation had not been made, the evidence at the hearing supports such a finding.
The first important fact to note was that the South Windsor police believed they probably had stopped suspects in a very recentshooting incident in Vernon. This information had just come over the police "hotline" that reached several town surrounding Vernon. (State's Exhibit "C.") Therefore, they were certainly justified in treating this as a "high risk" stop.
Certainly in the case of an investigation of a serious felony (with a shooting involved), the police are justified in ordering the suspects out of the car in a manner that is completely controlled by the police. Id. at 525. Sergeant Ritter of the South Windsor Police Department took charge of the investigatory stop. The Court finds that his actions were totally appropriate under the circumstances. Sgt. Ritter testified that he took the actions outlined at the hearing for several reasons, including the following:
(1) This was a "high risk" stop;
 (2) There was reason to believe the suspects might have been involved in a shooting;
 (3) he was concerned about the safety of the public, his police officers, and the suspects;
 (4) although the male suspects were "frisked", the female was not, because there was no female officer available;
 (5) no gun had been found in the car, or on the male; suspects, so the female might have had the gun;
 (6) he had five of the six officers on that shift at the scene of the stop, and if something else happened in town, he would have had to dispatch officers to the other CT Page 183 incident(s);
 (7) he knew it would take some time for Vernon to get to South Windsor with witnesses; and
 (8) they were on a busy road, and if one or more of the suspects tried to run, someone could have been injured.
The Court finds Sgt. Ritter's testimony to be credible and supported by corroborative facts. Sgt. Ritter probably would have been derelict in his duty to have handled this stop with less restraint on the suspects. If it turned out that the female suspect had the gun, or if the gun was well concealed in the car, and he had not restrained the suspects, he might have been responsible for someone having been shot. Based on the testimony at the hearing this Court believes that there was a very tense situation at the time of the stop. Also, due to the location of the stop, the possibility of an escape was a real concern. "`The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.'" State v. Holloman, supra, 20 Conn. App. 525, quotingAdams v. Williams, 407 U.S. 143, 145 (1972).
Based on these findings, and all the evidence at the hearing, the Court finds: (1) that the "Terry" stop was proper, (2) that no "arrest" occurred prior to the identifications of Ross and Casey, and (3) the restraints imposed on the suspects were proper and fully justified under the circumstances. State v. Holloman, supra,20 Conn. App. 526. Furthermore, the detention was reasonably calculated to maintain the status quo. State v. Foster,13 Conn. App. 214, 219 (1988).
A police officer does not have to use the least restrictive means to detain suspects. If, under the circumstances existing at the time of the stop, a police officer reasonably believes that substantial restraints are necessary for safety, then the Court should not second guess the police officer. Plakas v. Drinski,19 F.3d 1143, 1148-49 (7th Cir. 1994), cert. denied,115 S.C. 81 (1994): U.S. v. Sharpe, 470 U.S. 675 (1985); See also State v.Escobales, 16 Conn. App. 272, 275 (1988).
The defendants argue that the decision in State v. Braxton,196 Conn. 685, 688-90 (1985) requires the police to use the least restrictive means to detain the suspects for a short period of time CT Page 184 to investigate. Quite to the contrary, Braxton stands for the proposition that if the actions of the officer are "reasonable," then the Court should not second-guess the police officer. Id. at 690. Subsequent to the Braxton decision, in U.S. v. Sokolow,490 U.S. 1 (1989) the U.S. Supreme Court rejected the "least intrusive means" test for a "Terry" stop.
The defendants also argue that the instant case is controlled by State v. Edwards, 214 Conn. 57 (1990), which held that the limits of a "Terry" stop were exceeded when the accused was taken from his house to the police station for questioning. The ruling in Edwards is quite narrow. Edwards was taken to a police station in New Jersey, in handcuffs, to be questioned regarding a possible homicide in Connecticut. The Court held that when Edwards was transported, in handcuffs, from his house to the police station for questioning, told he was not free to leave, and given his Miranda
warnings, that the geographical boundaries of the "Terry-type" detention of the defendant was exceeded. Edwards supra, 214 Conn. 72-74. Since the suspects in the instant case were not taken from the scene of the "stop" until after they were arrested, Edwards is inapplicable.
The defendants also cite Oliveira v. Mayer, 23 F.3d 642 (2d Cir. 1994), cross petitions for cert. pending, in support of their claim that the nature of restraints and time that elapsed in the instant case, exceeded the bounds of a "Terry" stop. Once again,Oliveira is inapplicable to the instant case. Oliveira was a civil rights action (§ 1983) on behalf of three suspects who were stopped by six police officers, removed from their car, searched fully (as was the car), given Miranda warnings, and interrogated, even though no crime had been reported. As stated above, this Court finds that the actions of the South Windsor Police officers were reasonable and justified under the circumstances.
Finally, any evidence seized in a search of the car during the "Terry" stop is admissible into evidence if the search was reasonable and limited. The limitation relates to a "weapons search" for the protection of the investigating officer(s) and others. Michigan v. Long, 463 U.S. 1032, 1049-52 (1983). See alsoState v. Kyles, supra, 221 Conn. 660-62 (1992). In the instant case, a "spent" shell casing was located in an open plastic-molded pocket in the passenger side door. Assuming it is relevant to this case, it will be admissible into evidence. In addition, it also helped serve as a basis for continuing with the restraints on the suspects, since bullets are used with guns, and at that time, no CT Page 185 gun had been located.
The fact that there were two separate searches of the car is not a constitutional defect, so long as the second car search was for the purpose of looking for a weapon and the "vehicle frisk" nature of the search was not exceeded. The Court finds the two "vehicle frisks" were reasonable and legally performed. Id.
Likewise, a limited search or frisk for weapons, of the persons being detained, is permissible. In the instant case, there were two "pat downs" of the male suspects. However, even though the second "frisk" was more thorough than the first, neither one exceeded constitutionally acceptable limits. Ybarra v. Illinois,444 U.S. 85, 92-94 (1979). Once again, this Court finds that the multiple "frisks" of the suspects was totally justified under the circumstances. None of the "frisks" exceeded the constitutional boundaries established by "Terry" and subsequent cases.
The final question under these issues is whether a one-hour delay before the identification process began was too long. Once again, the Court must review all the circumstances to determine if the delay was reasonable. The primary question is whether the police acted diligently under the circumstances to dispel or confirm their suspicions. State v. Foster, 13 Conn. App. 218. Any delay that is attributed to lack of diligence by the police would be unacceptable. Id. at 219.
A one-hour delay has been upheld in several cases, including:State v. Foster, supra, 13 Conn. App. 214; State v. Manson, supra,13 Conn. App. 220; United States v. Richards, 500 F.2d 1025 (9th Cir. 1974), 420 U.S. 924 (1975). In the instant case, as noted above, there was substantial communications and coordination necessary to line up the witnesses and transport them to South Windsor. Under the circumstances in this case, the Vernon officers were facing a chaotic and possibly explosive situation. At the same time, South Windsor police had a tense situation at the "high risk" stop. Neither department had an excess of officers available. Under all the circumstances, this Court finds that both departments proceeded diligently, with appropriate caution to complete the investigatory process. State v. Foster, supra,13 Conn. App. 219.
The Court has considered that it obviously took some time for Vernon Police Officers to determine who the most likely witnesses would be, since they were looking at a possible connection between CT Page 186 two different crimes. Also, the witnesses from Vernon were at two different locations. It was important to coordinate the trip to South Windsor, so they would arrive together. The trip itself probably took about twenty-five minutes. It also took about ten minutes for Sergeant Simon of Vernon and Sergeant Ritter of South Windsor to work out the procedure for the identification process. Based on all these considerations, a one-hour delay was reasonable.
Based on these rulings, the Court will not address the issue of inevitable discovery of evidence in any detail. However, based on the evidence presented at the hearing, the Court finds that the evidence in the car would have been discovered by an automobile inventory, such as the one performed at the South Windsor Police Department. In the alternative, it would have been discovered through the search authorized by the warrant, signed by a judge, after the defendants' arrests.
LAW (Issue #2)
The second issue briefed and argued by the defendants is whether or not the identification process was "unnecessarily suggestive." Secondly, if it was, then whether or not it was still reliable under the totality of the circumstances.
The state concedes that the identification process was suggestive. The state claims it was not "impermissibly suggestive." See State v. Mitchell, 204 Conn. 187, 201, cert. denied, 484 U.S. 927 (1987). The facts in the instant case outlined in detail earlier in this opinion, clearly shows that although the identification process was suggestive, it was not "unnecessarily" so.
The defendants argue that, by implication, when you have several suspects lined up, with police officers surrounding them, that alone is unnecessarily suggestive. Furthermore, if the four suspects all have their hands behind their backs, it is obvious they are handcuffed.
Based on the testimony of the police officers involved and the several witnesses, the Court finds that the process was notunnecessarily suggestive. As discussed in the preceding section of this decision, this was a "high risk" stop that required restraints for the safety of police officers and others. Therefore, it would have been unwise to take the suspects to Vernon to 104 Talcott Avenue or to the X-tra Mart for identification. The situation at CT Page 187 those locations was chaotic and possibly explosive.
It would have been impermissible to take them to the Police Station for a show-up. That would have exceeded the geographic boundaries of the "Terry" stop. Edwards, 214 Conn. 57.
The two police sergeants (Simon and Ritter) carefully arranged a procedure for viewing that diminished the suggestiveness. They started at a point where the witnesses could not see the suspects or the suspect-car. They then drove one witness at a time in an unmarked car, toward the four suspects. They did not let the witnesses talk to each other about the process.
They drove the car to within about fifty feet of the suspects. The suspects were standing as shown in State's Exhibit "F". Although the suspects were handcuffed, they had their hands behind their backs. (Only one witness, Jeffrey Hansen, "presumed" they were handcuffed. However, he testified that he did not see the handcuffs. He also testified that if they were handcuffed that did not affect his identification). Although there were police officers near the suspects, the officers apparently stayed several feet away from the suspects.
The only time the four suspects turned around was when the first witness, Lauren Vitale, asked to see the back of the female suspect's shirt. That was only after she made a positive identification of MS. Casey and Mr. Ross. She also testified that she did not see handcuffs.
When Lauren first identified Ms. Casey and Mr. Ross, the officer asked her if she was "50% certain or 100% certain." She responded that she was "200% certain." She was unable to clearly identify one juvenile. She described in detail the actual location on the porch at 104 Talcott Avenue, where she saw each suspect.
She testified that she clearly identified Ms. Casey by her face, and Mr. Ross primarily by his clothing.
The other witnesses were each driven down to the spot within fifty feet of the suspects, one by one. No witnesses could see the witness actually making an identification. Each was brought back and told not to talk to the other witnesses. One witness, an upstairs neighbor of Michaud, was not able to identify anyone, or the car. He had seen a black woman get out of a Ford LTD. and walk toward the house about one hour before the shooting. That woman CT Page 188 apparently was not one of the four suspects.
The other witnesses related to the earlier incidents on Village, Ward and Union Streets. Once again, they each were able to identify some, but not all of the suspects.
The Court finds that all the procedures used to reduce suggestiveness were effective. Therefore, the Court finds the identification process was not "impermissibly" or "unnecessarily" suggestive. State v. Wooten, 227 Conn. 677, 685 (1993).
Even if, however, the process had been "unnecessarily" suggestive, the Court finds, based on the testimony of the witnesses, that the identifications were "reliable." In considering the totality of the circumstances, the Court notes that each witness was alone when he or she made the identifications. No witness talked to the other witnesses until the entire process was concluded. No witness watched earlier witnesses make their identifications. In fact, all the witnesses, except two, asked to have their heads covered with a jacket, so they really could not be seen by the other witnesses.
Several witnesses identified one or more of the suspects, but none identified all four. It was obvious from their testimony that they were not just identifying people to please the police officers. The images of the people the witnesses had seen in Vernon were fresh in their minds, because it was less than 1 1/2 hours; after the Michaud shooting and less than two hours after the Benny Cruz robbery, State v. Collette, supra, 199 Conn. 310-11.
The Court has considered the witnesses' degree of attention during the roadside show-up, the accuracy of their prior description, the level of certainty (particularly Lauren Vitale, who was the only eye-witness at the Michaud shooting) and the time that had elapsed since the crimes. Based on the totality of the circumstances, the Court finds the identifications to be reliable.State v. Johnson, 22 Conn. App. 477, 482-83 (1990).
Similarly, the court finds the identifications of the car to be reliable, based on the totality of the circumstances. Whether or not the state can show that the car is relevant to the Michaud shooting is another question. But, the Court notes that the car was just one of a mosaic of facts that, pieced together, helped establish probable cause for the arrest of Mr. Ross and Ms. Casey. CT Page 189
Finally, the defendants argued that the identifications were inherently unreliable because they were all cross-racial identifications. Neither defendant, however, presented any evidence to support this claim. Likewise, neither defendant briefed this issue or cited a case to support this claim. Therefore, the court has no basis to consider this claim. The Court deems the claim abandoned.
CONCLUSION
Based on all the reasons set forth in this decision, both of defendants' motions to suppress evidence are denied in their entirety. All evidence seized, if relevant, will be admissible in evidence at trial.
Concerning the first issue, the "Terry" stop was valid, no "arrest" occurred before the identifications, and after the identifications probable cause existed to arrest Edwin Ross and Ebony Casey. The "pat downs" and "vehicle frisks" were performed within constitutional limits.
Regarding the second issue, the Court finds that the identification process on Route 5 in South Windsor was not "unnecessarily" or "impermissibly" suggestive. If, however, the process had been "impermissibly" suggestive, the Court finds the identifications to be reliable, based on the totality of the circumstances.
BY THE COURT,
Hon. Jonathan J. Kaplan, Superior Court Judge