## STATE OF CONNECTICUT *v.* TERRENCE TRINE
### (15277)

Peters, C. J., and Callahan, Borden, Berdon and Katz, Js.

Argued December 5, 1995—decision released March 12, 1996

*Kevin T. Kane,* state's attorney, with whom, on the brief, was *Keith Currier,* certified legal intern, for the appellant (state).

*Dominic S. Piacenza,* with whom, on the brief, was *Richard T. Miller,* certified legal intern, for the appellee (defendant).

*G. Douglas Nash,* chief of legal services, and *Gerard A. Smyth,* chief public defender, filed a brief for the office of the chief public defender as amicus curiae.

PETERS, C. J. The principal issue in this certified appeal is whether, in all circumstances, article first, § 7, of the Connecticut constitution[1] prohibits the seizure

---

[1] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unrea-

of nonthreatening contraband that a police officer feels during a lawful patdown search for weapons. The state charged the defendant, Terrence Trine, with possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a).[2] After an evidentiary hearing, the trial court, *Parker, J.*, denied the defendant's motion to suppress the narcotics that had been seized from him. Pursuant to General Statutes § 54-94a and Practice Book § 4003 (a),[3] the defendant then entered a condi-

sonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[2] General Statutes § 21a-277 provides in relevant part: "Penalty for illegal manufacture, distribution, sale, prescription, dispensing. (a) Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter . . . shall be [punished]."

[3] General Statutes § 54-94a provides in relevant part: "Conditional nolo contendere plea. Appeal of denial of motion to suppress or dismiss. When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ."

Practice Book § 4003 provides in relevant part: "Appeals of Rulings on Motions to Dismiss or Suppress Following Judgments Entered Upon Conditional Pleas of Nolo Contendere

"(a) When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . . A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution. The court shall not accept a nolo contendere plea pursuant to this subsection where the denial of the motion to suppress would not have a significant impact upon the disposition of the case in the trial court. The court shall

tional plea of nolo contendere to the charge against him. The trial court, *Purtill, J.*, accepted the plea and rendered judgment thereon. The defendant appealed to the Appellate Court, which reversed the judgment of conviction on the ground that the seizure of the narcotics violated the defendant's rights under article first, § 7. *State* v. *Trine*, 37 Conn. App. 561, 657 A.2d 675 (1995). We granted the state's petition for certification to appeal,[4] and we now reverse the judgment of the Appellate Court.

The opinion of the Appellate Court recounts the relevant facts adduced at the hearing on the defendant's motion to suppress. "On March 26, 1993, Officers James Cash and Steven Sinagra of the statewide narcotics task force, a police squad consisting of officers of the Connecticut state and local police, applied for a search warrant authorizing the search of the person and residence of Marybeth Montesi. Partially on the basis of information given to them by two confidential informants, the officers stated that they had reason to believe that Montesi was involved in the sale of cocaine from her home in East Lyme. The warrant was issued the same day and entitled the officers to search Montesi's person and residence for various items common to trafficking in narcotics, including weapons and handguns.

"That afternoon, the team assigned to execute the search warrant met for a preraid briefing. Sergeant Lawrence Pagan, a member of the Connecticut state police with fifteen years experience as a state police officer

also decline to accept such a nolo contendere plea where the record available for review of the denial of the motion to suppress . . . is inadequate for appellate review of the court's determination thereof."

[4] We granted the state's petition for certification to appeal, limited to the following issue: "In the circumstances of this case, does article first, § 7, of the Connecticut constitution require the suppression of contraband evidence obtained by a police officer during a patdown search?" *State* v. *Trine*, 234 Conn. 903, 660 A.2d 858 (1995).

and three years experience as the sergeant in charge of the eastern division of the statewide narcotics task force, led the team. Pagan was familiar with the contents of the affidavits used in connection with the application for the search warrant and was aware that those affidavits indicated a probability of weapons being found at the scene of the search. He was also aware that the warrant application sought an order of nondisclosure of the warrant and affidavits, alleging that there existed a risk that Montesi or an associate might seek reprisals against the confidential informants that had been the source of the information on which the application was predicated.

"At approximately 3 p.m., the task force arrived at Montesi's home. Because of the home's location, the task force was unable to conduct surveillance of the area without discovery. As a consequence, the officers were unable to ascertain who or how many persons might be present on the premises when the warrant was executed.

"The officers gained entrance to the premises by use of a battering ram and entered with their weapons drawn. Pagan was the second officer to enter the premises, and he observed that three persons were present: two men and one woman. Pagan immediately directed his attention to the man closest to him, later identified as the defendant. Pagan ordered the defendant to lie down on the floor on his stomach with his hands behind his head. The defendant complied with the officer's direction. Pagan holstered his weapon and handcuffed the defendant with his arms behind his back. He then patted down the defendant for the purpose of discovering whether the defendant was carrying a weapon. The search revealed that the defendant was not armed.

"In the course of conducting his patdown of the defendant, Pagan felt a hard object in the area of the

right front pocket of the defendant's blue jeans and simultaneously heard a sound made by plastic. Pagan immediately concluded that the object that he felt was rock cocaine on the basis of his knowledge that rock cocaine was hard and often kept in small plastic bags, like the object that he felt in the defendant's pocket. Pagan reached into the defendant's pocket, seized the object and arrested him for a narcotics violation. It was later discovered that the bag recovered from the defendant's pocket contained approximately one ounce of rock cocaine." Id., 562–64.

The defendant moved to suppress the cocaine that had been seized from him on the ground that it had been discovered during an unconstitutional search. The trial court denied the defendant's motion in light of its determination that Pagan had violated no constitutional prohibitions either in his initial protective patdown search for weapons or in his subsequent search of the defendant's pocket.

In upholding the validity of the seizure of the cocaine, the trial court first concluded that Pagan had been justified in conducting a patdown search of the defendant for weapons because he had possessed a reasonable and articulable suspicion that the defendant might have been armed and dangerous. The trial court further concluded that Pagan's immediate belief that he had felt rock cocaine while conducting a lawful patdown search, coupled with the earlier determination by a neutral magistrate of probable cause to believe that narcotics would be found on the premises, gave Pagan probable cause to believe that the defendant illegally possessed narcotics. In light of this latter conclusion, the trial court determined that Pagan had a legal basis for seizing the cocaine from the defendant's pocket.

In his appeal to the Appellate Court, the defendant challenged the validity of the seizure. The defendant

claimed that the trial court improperly had concluded that: (1) Pagan could legally conduct an initial patdown search of the defendant because he had possessed a reasonable and articulable suspicion that the defendant might have been armed and dangerous; and (2) despite his determination that the defendant was unarmed, Pagan could legally search the defendant's pocket and seize the cocaine found therein. Although the Appellate Court upheld the validity of the initial patdown search, it concluded, under article first, § 7, that Pagan lacked constitutional authority to search the defendant any further once he had determined that the object he had felt in the defendant's pocket during the lawful patdown search was not a weapon. Id., 573. The Appellate Court therefore reversed the judgment convicting the defendant.

The state and the defendant have both challenged the decision of the Appellate Court. The defendant renews his claim that the initial patdown search violated his state and federal constitutional rights to be free from unreasonable searches and seizures.[5] The state reiterates its claim, which the trial court accepted and the Appellate Court rejected, that the search of the defendant's pocket and the seizure of the cocaine from that pocket did not violate the defendant's state and federal constitutional rights because this search and seizure occurred during the course of a lawful arrest. We agree with the state that, in the circumstances of this case, neither the initial patdown search of the defendant nor the subsequent search of his pocket and seizure of the cocaine violated his constitutional rights.

[5] The defendant raised this claim as an alternate ground on which to affirm the judgment of the Appellate Court, and filed a statement pursuant to Practice Book § 4140 that he would present the claim. See *State* v. *Lee*, 229 Conn. 60, 65–66 n.6, 640 A.2d 553 (1994). Because review of this claim is necessary to determine the issue that we certified for review, we will address it.

## I

We begin our analysis by considering the defendant's challenge to the validity of the patdown search that preceded and ultimately led to the search of the defendant's pocket and the seizure of the cocaine. In agreement with the trial court, the Appellate Court concluded that the patdown search was valid because Pagan had possessed a reasonable and articulable suspicion that the defendant might have been armed and dangerous. Id. Both courts also concluded that Pagan had not exceeded the legitimate scope of a patdown search for weapons. See id. We are unpersuaded by the defendant's contentions to the contrary.

Under the fourth amendment to the United States constitution,[6] and under article first, § 7,[7] and article first, § 9,[8] of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime. *Terry* v. *Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State* v. *Oquendo*, 223 Conn. 635, 654, 613 A.2d 1300 (1992); *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990). If, during the course of a lawful investigatory detention, the officer reasonably believes that the detained individual might

[6] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment to the United States constitution is made applicable to the states by the fourteenth amendment. *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[7] See footnote 1.

[8] The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

be armed and dangerous, the officer may undertake a patdown search of the individual to discover weapons. *Terry* v. *Ohio*, supra, 24; *State* v. *Kyles*, 221 Conn. 643, 661, 607 A.2d 355 (1992); *State* v. *Williams*, 157 Conn. 114, 118–19, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969).

Because a patdown search is intended to secure the safety of the investigating officer, it is strictly limited to a search for weapons. The officer cannot "conduct a general exploratory search for whatever evidence of criminal activity [the officer] might find." *Terry* v. *Ohio*, supra, 392 U.S. 30; *Minnesota* v. *Dickerson*, 508 U.S. 366, 378, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993); *Sibron* v. *New York*, 392 U.S. 40, 63–65, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). Furthermore, a patdown search for weapons that is justified at its inception becomes constitutionally infirm if the search thereafter becomes more intrusive than necessary to protect the safety of the investigating officer. *Minnesota* v. *Dickerson*, supra, 378; see *State* v. *Edwards*, 214 Conn. 57, 71–72, 570 A.2d 193 (1990); *State* v. *Mitchell*, 204 Conn. 187, 197, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

Any inquiry into the permissible justification for, and boundaries of, a particular investigatory detention and patdown search is necessarily factbound. *Terry* v. *Ohio*, supra, 392 U.S. 29; *State* v. *Edwards*, supra, 214 Conn. 71–72; *State* v. *Aillon*, 202 Conn. 385, 401, 521 A.2d 555 (1987). "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 65, 646 A.2d 835 (1994), cert. denied, U.S. , 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995).

On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is "clearly erroneous in view of the evidence and pleadings in the whole record . . . ." Practice Book § 4061; *State* v. *Oquendo*, supra, 223 Conn. 645; *State* v. *Kyles*, supra, 221 Conn. 660. The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence. *State* v. *Oquendo*, supra, 645; *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). Because a trial court's determination of the validity of a patdown search implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. See *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Damon*, 214 Conn. 146, 154, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990); *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990).

In the circumstances of this case, we agree with the Appellate Court that the trial court properly determined that the patdown search was constitutional. Pagan and his fellow police officers entered Montesi's residence to search for cocaine and other narcotics pursuant to a valid search warrant.[9] "[T]he execution of a warrant to search for narcotics is the kind of transaction that might give rise to sudden violence . . . ." *Michigan* v. *Summers*, 452 U.S. 692, 702, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981). Pagan knew that the magistrate who

---

[9] The defendant has never challenged the validity of the search warrant.

issued the search warrant had found probable cause to believe that weapons as well as narcotics were located on the premises. This specific finding by the magistrate bolstered Pagan's general awareness that narcotics traffickers are often armed. See *State* v. *Cooper*, 227 Conn. 417, 426 n.5, 630 A.2d 1043 (1993) (recognizing correlation between drug dealing and firearms). Pagan also knew that the warrant application had requested nondisclosure of its contents because of concerns that Montesi or her associates might retaliate against the confidential informants who had assisted the police. These facts, and the reasonable inferences to be drawn therefrom, amply support the trial court's conclusion that Pagan had a reasonable and articulable suspicion that the defendant might have been armed and dangerous.[10]

The record also supports the trial court's finding that Pagan never exceeded the strictly circumscribed scope of a lawful patdown search for weapons. The trial court found credible Pagan's testimony that he had searched the defendant solely to discover weapons. Pagan testified that he had limited his search to an open, flat-handed patdown of the exterior of the defendant's clothing. When Pagan felt an object in the defendant's pocket during the course of the patdown search, he did not manipulate the object to discern its identity. Having immediately determined that the object was not a weapon, he continued to conduct the patdown search. It was only after having ascertained that the defendant was unarmed that Pagan, believing that the object that he had felt during the patdown search was packaged rock cocaine, searched the defendant's pocket and

---

[10] The defendant does not claim that his initial detention in Montesi's residence was not based on a reasonable and articulable suspicion that he had committed or was about to commit a crime. The defendant also does not claim that Pagan's use of handcuffs during the patdown search constituted a seizure that required probable cause rather than a reasonable and articulable suspicion that the defendant might have been armed and dangerous.

seized the cocaine. The trial court was not required to believe the contrary testimony of the defendant and Montesi to the effect that Pagan initially had conducted a full search of the defendant's person rather than a patdown search for weapons. "The determination of a witness' credibility is the special function of the trial court. This court cannot sift and weigh evidence." (Internal quotation marks omitted.) *State* v. *Cofield*, supra, 220 Conn. 49; see *State* v. *Ruscoe*, 212 Conn. 223, 242, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); *State* v. *Zindros*, 189 Conn. 228, 240, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984).

Our review of the record shows that, in light of the facts found by the trial court, the Appellate Court properly concluded that the patdown search for weapons was constitutionally valid. Pagan did not act upon whim, speculation or pretext when he conducted the patdown search. Rather, Pagan acted upon his reasonable suspicion, sufficiently articulated in his testimony as credited by the trial court, and objectively supported by the circumstances surrounding his encounter with the defendant, that the defendant might have been armed and dangerous. Further, the patdown search did not exceed constitutionally permissible bounds, because Pagan limited the search to a flat-handed patdown for weapons, and did not manipulate the object that he discerned or otherwise extend the scope of the search.

II

We next turn to an analysis of the constitutional validity of the subsequent search of the defendant's pocket and the seizure of the cocaine from that pocket. The Appellate Court construed article first, § 7, of the state constitution to prohibit the warrantless seizure of contraband, other than weapons, that a police officer

detects during a lawful patdown search. *State* v. *Trine*, supra, 37 Conn. App. 564–65. We disagree with the Appellate Court that, regardless of the circumstances, our constitution bars the seizure of lawfully detected nonthreatening contraband. In this case, we conclude that there was no constitutional infirmity in Pagan's discovery of the cocaine in the defendant's pocket or in Pagan's subsequent seizure of the contraband, incident to the defendant's arrest. Accordingly, we reverse the judgment of the Appellate Court.

## A

The constitutional validity of the seizure of nonthreatening contraband discovered during the course of a lawful patdown search for weapons is an open question only under our state constitution. As a matter of federal constitutional law, *Minnesota* v. *Dickerson*, supra, 508 U.S. 373, establishes the principle that the fourth amendment to the United States constitution permits a police officer, even though acting without a warrant, to seize nonthreatening contraband that the officer has detected through the sense of touch during a lawful patdown search. In that case, the United States Supreme Court held that, for purposes of constitutional analysis, detection by plain feel is not inherently distinguishable from detection by plain view. Id., 374–76. The United States Supreme Court reasoned that nonthreatening contraband detected through a police officer's sense of touch during a patdown search validly may be seized: "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." Id., 375–76.[11]

---

[11] Many courts and commentators justify the warrantless seizure of nonthreatening contraband so detected as falling within the "plain feel" or "plain

Consistent with the overall limitations of the fourth amendment, however, a police officer may not lawfully seize an object felt during a patdown search if the officer discerns the identity of the object by exceeding the valid scope of the patdown search. In *Minnesota* v. *Dickerson*, supra, 508 U.S. 378, the search was determined to have been constitutionally impermissible because the investigating police officer had not limited his search to a lawful patdown search. Rather, the officer had engaged in " 'squeezing, sliding and otherwise manipulating the contents of the defendant's pocket'—a pocket which the officer already knew contained no weapon." (Internal quotation marks omitted.) Id. Applying the reasoning of *Dickerson* to the facts of this case, we are persuaded that the defendant has not established a violation of his federal constitutional rights, because Pagan's patdown search of the defendant did not exceed the permissible scope of a search for weapons.

We, of course, are not bound by the decisions of the United States Supreme Court in interpreting the contours of article first, § 7. "[W]e may find greater protection of individual rights under our state constitution than that provided by the federal constitution." (Internal quotation marks omitted.) *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993); *State* v. *Lamme*, supra, 216 Conn. 183. In several instances, we have concluded that the protections afforded to the citizens of this state by article first, § 7, extend beyond those provided by the fourth amendment, as that provision has been interpreted by the United States Supreme Court. See *State* v. *Miller*, supra, 379, 386–87; *State* v. *Oquendo*, supra, 223 Conn. 651–52; *State* v. *Geisler*, 222 Conn. 672, 690, 610 A.2d 1225 (1992); *State* v. *Marsala*,

touch" corollary to the plain view doctrine. See, e.g., *Minnesota* v. *Dickerson*, supra, 508 U.S. 371 n.1 and cases cited therein.

216 Conn. 150, 151, 160–61, 579 A.2d 58 (1990); *State* v. *Dukes*, 209 Conn. 98, 120, 122–23, 547 A.2d 10 (1988).[12]

The Appellate Court held that article first, § 7, unlike its federal counterpart, categorically prohibits a police officer from seizing, without a warrant, nonthreatening contraband that is felt during a lawful patdown search. We disagree. The fundamental premise of *Minnesota* v. *Dickerson,* supra, 508 U.S. 376–77, is that a police officer's tactile perceptions, formed during a lawful patdown search, in appropriate circumstances may provide the officer with probable cause to believe that an object felt during the search is nonthreatening contraband. We are persuaded that this premise equally applies to searches and seizures analyzed under article first, § 7.

Our prior cases interpreting article first, § 7, support the conclusion that our constitution places no categorical constraints, as a matter of law, on the types of legally obtained information that may suffice to establish probable cause to search or to seize. In the determination of whether probable cause exists for warrantless searches and seizures, trial courts are authorized by article first, § 7, to consider *all* of the legally obtained facts available

---

[12] When evaluating the rights afforded to Connecticut citizens under the state constitution, we consider, to the extent applicable, six factors: (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of our constitutional forebears; and (6) contemporary understandings of applicable economic and sociological norms. *State* v. *Ross,* 230 Conn. 183, 249, 646 A.2d 1318 (1994), cert. denied,     U.S.    , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); *State* v. *Geisler,* supra, 222 Conn. 685. In this case, we have been unable to discern any textual or historical basis for assigning independent meaning to our state constitutional provision. Cf. *State* v. *Joyce,* 229 Conn. 10, 19, 639 A.2d 1007 (1994). Our own precedents provide no direct support for such a distinction, and the rulings of the courts of sister states are, at best, sparse and divided. See footnote 13. The parties have advanced no compelling socioeconomic considerations other than those that we address in text.

to a police officer, and *all* of the reasonable inferences that might be drawn therefrom in light of the officer's training and experience. See, e.g., *State* v. *Dukes*, supra, 209 Conn. 123–25; *State* v. *Kimbro*, 197 Conn. 219, 222–23, 496 A.2d 498 (1985), overruled in part on other grounds, *State* v. *Barton*, 219 Conn. 529, 594 A.2d 917 (1991). Although not expressly relying upon article first, § 7, we have consistently held that such legally relevant information includes inferences drawn from an investigating officer's use of his or her sense of smell or hearing. See, e.g., *State* v. *Copeland*, 205 Conn. 201, 213, 530 A.2d 603 (1987) (odor may establish probable cause to arrest); *State* v. *Asherman*, 193 Conn. 695, 709–10, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985) (same); *State* v. *Elliott*, 153 Conn. 147, 152–53, 215 A.2d 108 (1965) (noise may establish probable cause to arrest). A police officer's use of information lawfully obtained through the sense of touch to establish probable cause is entirely consistent with these precedents.

Without questioning this generally accepted jurisprudence, the Appellate Court advanced two alternate justifications for a categorical rule barring the warrantless seizure of nonthreatening contraband detected by a police officer through the sense of touch during a lawful patdown search. The Appellate Court reasoned that "the sense of touch is far more unreliable and touching far more intrusive into the right of personal privacy expected by our citizens . . . ." *State* v. *Trine*, supra, 37 Conn. App. 572. Neither justification persuades us.[13]

---

[13] Our research has revealed that the highest appellate courts of three states have analyzed whether, as a matter of state constitutional law, a police officer may validly seize, without a warrant, nonthreatening contraband detected by the officer through the sense of touch during a lawful patdown search. The Supreme Court of Illinois and the Supreme Court of Kentucky have held that their respective state constitutions do not categorically bar such seizures. *People* v. *Mitchell*, 165 Ill. 2d 211, 650 N.E.2d 1014, 1018 (1995); *Commonwealth* v. *Crowder*, 884 S.W.2d 649, 652 (Ky. 1994). The New York Court of Appeals has held that its state constitution bars such seizures in

Whether the sense of touch is a reliable investigative tool depends upon the circumstances in which it is used. The Appellate Court cited no basis for a contrary conclusion, and we are not prepared to assume that the sense of touch is inherently less reliable than other senses that a police officer may rely upon as means of identifying an object. Contraband may well possess tactile characteristics that, to a trained and experienced police officer, are as discernible and distinctive as a familiar sight, odor, taste or sound. "Actions and things observed by an experienced law enforcement officer might have more significance to him in determining whether the law is being violated at a given time and place than they would have to a layman . . . ." (Internal quotation marks omitted.) *State* v. *Dukes*, supra, 209 Conn. 123; see *Texas* v. *Brown*, 460 U.S. 730, 742–43, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983) (plurality opinion).

The constitutional acceptance of patdown searches for weapons belies the contention that the sense of touch is inherently less reliable than the other senses. The very premise underlying patdown searches, which we have expressly approved under our state constitution; *State* v. *Williams*, supra, 157 Conn. 118–19; "is that officers will be able to detect the presence of weapons through the sense of touch." *Minnesota* v. *Dickerson*, supra, 508 U.S. 376. Just as a trained and experienced

the absence of a recognized exception to the search warrant requirement that is established independently from information obtained through the sense of touch during a lawful patdown search. *Matter of Marrhonda G.*, 81 N.Y.2d 942, 945, 613 N.E.2d 568, 597 N.Y.S.2d 662 (1993); *People* v. *Diaz*, 81 N.Y.2d 106, 112 and n.2, 612 N.E.2d 298, 595 N.Y.S.2d 940 (1993). The Court of Appeals based its holding on the same justifications advanced by our Appellate Court in this case. *People* v. *Diaz*, supra, 111–12.

The Supreme Court of Minnesota, which concluded that such a seizure violated the fourth amendment to the United States constitution; *State* v. *Dickerson*, 481 N.W.2d 840, 845 (Minn. 1992), aff'd on other grounds, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993); has not revisited this issue under its state constitution.

police officer may use the sense of touch during a lawful patdown search to detect one of the myriad of weapons that an individual might conceal on his or her person; see *Terry* v. *Ohio*, supra, 392 U.S. 29 (scope of patdown search confined to intrusion reasonably designed to discover "guns, knives, clubs, or other hidden instruments for the assault of the police officer"); so the officer may use that same sense of touch to discern the presence of nonthreatening contraband that possesses distinctive tactile characteristics.

For similar reasons, searches dependent upon the sense of touch are not inherently more invasive of an individual's privacy interests than are other constitutionally permissible invasions of the individual's bodily integrity. The personal intrusiveness of a lawfully circumscribed patdown search is not exacerbated by the discovery of nonthreatening contraband rather than weapons. *Minnesota* v. *Dickerson*, supra, 508 U.S. 378. Furthermore, once the narrow limits of a lawful patdown search have been reached, any further intrusion into personal privacy is permissible only if based upon an independent justification, either upon a warrant supported by probable cause or upon a recognized exception to the warrant requirement. See id.; see also *State* v. *Edwards*, supra, 214 Conn. 72–73.

We are persuaded that existing restrictions on the use of information obtained during a lawful patdown search adequately protect individual privacy interests. The incriminating nature of a nonthreatening object felt during a patdown search must be immediately apparent; the police officer who conducts the search cannot manipulate the object to discern its identity. *Minnesota* v. *Dickerson*, supra, 508 U.S. 376–77. In addition, the officer's belief that the object is contraband must be objectively reasonable in light of all of the circumstances known at the time of the search. The conclusion drawn by the officer that an object is contraband is

subject to judicial review of the reasonableness of that conclusion and of the officer's compliance with established constitutional requirements.

We hold, therefore, that article first, § 7, does not categorically bar a police officer from seizing, without a warrant, nonthreatening contraband that the officer feels during a lawful patdown search. In so holding, we do not create a new exception to the warrant requirement. A valid warrantless search or seizure will continue to require the showing of circumstances that satisfy an existing exception to the warrant requirement. We merely conclude that information obtained through the sense of touch during a lawful patdown search may be used to establish such probable cause as is necessary to trigger an exception to the warrant requirement. The reliability and immediacy of information obtained through any of the senses ultimately, and necessarily, depend on the circumstances of each individual case rather than on per se legal categorization.

B

Having concluded that article first, § 7, does not categorically bar the seizure of nonthreatening contraband detected through the sense of touch during a lawful patdown search, we must next determine whether, in the circumstances of this case, the search of the defendant's pocket[14] and the seizure of the cocaine from that pocket were constitutionally valid. The Appellate Court did not reach this issue. In light of the validity of the patdown search; see part I; the state urges us to hold that the trial court properly concluded that Pagan had probable cause to believe that the object in the defend-

[14] At the hearing on the defendant's motion to suppress, Pagan testified that after he had conducted the patdown search and before he had seized the cocaine, he "pulled over the lip of the [defendant's] pants pocket and observed the top of a rolled up plastic bag containing a white powder substance." For purposes of analysis, therefore, we will treat Pagan's conduct subsequent to the patdown search as both a search and a seizure.

ant's pocket was cocaine and, therefore, that Pagan had probable cause to arrest the defendant. The state further argues that, having had such probable cause, Pagan also had the authority to search the defendant's pocket and seize the cocaine incident to the defendant's lawful arrest. We agree with the state.[15]

The police ordinarily may not conduct a search and make a seizure unless a neutral and detached magistrate first issues a warrant based on probable cause. "[A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Internal quotation marks omitted.) *State* v. *Lewis*, 220 Conn. 602, 609, 600 A.2d 1330 (1991); *State* v. *Copeland*, supra, 205 Conn. 209. Exceptions to the search warrant requirement " 'have been jealously and carefully drawn'; *Jones* v. *United States*, 357 U.S. 493, 499, 78 S. Ct. 1253, 2 L. Ed. 2d 1514 (1958); and the burden is on the state to establish the exception." *State* v. *Badgett*, 200 Conn. 412, 424, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986); *State* v. *Zindros*, supra, 189 Conn. 237.

One recognized exception to the warrant requirement applies when a search is conducted incident to a lawful custodial arrest. *New York* v. *Belton*, 453 U.S. 454, 457–58, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981); *State* v. *Delossantos*, 211 Conn. 258, 266–67, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989); *State* v. *Cobuzzi*, 161 Conn. 371, 373, 288 A.2d 439 (1971), cert. denied, 404 U.S. 1017, 92 S. Ct. 677, 30 L. Ed. 2d 664 (1972). This exception permits a police officer to conduct a full search of an arrestee and to

---

[15] The state claims, in the alternative, that the seizure of the cocaine was justified under the exigent circumstances exception to the search warrant requirement. See *State* v. *Geisler*, supra, 222 Conn. 690–92. Because we conclude that the cocaine was properly seized during a search incident to a lawful arrest, we need not address this alternate claim.

seize evidence as well as weapons. See *Chimel* v. *California*, 395 U.S. 752, 762–63, 89 S. Ct. 2034, 23 L. Ed. 2d 685, reh. denied, 396 U.S. 869, 90 S. Ct. 36, 24 L. Ed. 2d 124 (1969); *State* v. *Copeland*, supra, 205 Conn. 210–11; *State* v. *Guertin*, 190 Conn. 440, 454, 461 A.2d 963 (1983); but see *State* v. *Dukes*, supra, 209 Conn. 122–23 (stating in dictum that scope of search incident to lawful arrest of traffic offender, as opposed to criminal offender, limited to search necessary to discover weapons). Even if a search and seizure chronologically precede a formal arrest, the search and seizure may be constitutionally valid as long as the arrest and the search and seizure are substantially contemporaneous and are integral parts of the same incident. *Rawlings* v. *Kentucky*, 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980); *State* v. *Federici*, 179 Conn. 46, 54–55, 425 A.2d 916 (1979).

A lawful warrantless felony arrest requires that the arrest be supported by probable cause. General Statutes § 54-1f (b);[16] *State* v. *Dennis*, 189 Conn. 429, 431, 456 A.2d 333 (1983); *State* v. *Cobuzzi*, supra, 161 Conn. 376. "Probable cause to arrest exists if (1) there is probable cause to believe a crime has been committed; and (2) there is probable cause to believe that the person to be arrested committed that crime." (Internal quotation marks omitted.) *State* v. *Magnotti*, 198 Conn. 209, 213, 502 A.2d 404 (1985); *State* v. *Guertin*, supra, 190 Conn. 446. "Probable cause exists when the facts and circum-

[16] General Statutes § 54-1f provides in relevant part: "Arrest without warrant. Pursuit outside precincts. . . .

"(b) Members of the division of state police within the department of public safety or of any local police department or any chief inspector or inspector in the division of criminal justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony."

"[T]he term 'reasonable grounds' as used in [§ 54-1f (b)] is to be equated with probable cause." *State* v. *Dennis*, 189 Conn. 429, 431, 456 A.2d 333 (1983); *State* v. *Love*, 169 Conn. 596, 599, 363 A.2d 1035 (1975).

stances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed." *State* v. *Cobuzzi*, supra, 376; *State* v. *Velez*, 215 Conn. 667, 672, 577 A.2d 1043 (1990). "The probable cause test then is an objective one." *State* v. *Copeland*, supra, 205 Conn. 213.

While probable cause requires more than mere suspicion; *In re Keijam T.*, 221 Conn. 109, 115–16, 602 A.2d 967 (1992); *State* v. *Copeland*, supra, 205 Conn. 213; the line between mere suspicion and probable cause "necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992); *State* v. *Magnotti*, supra, 198 Conn. 213. The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. *State* v. *Middleton*, 170 Conn. 601, 603, 368 A.2d 66 (1976); *State* v. *Cobuzzi*, supra, 161 Conn. 376. "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar* v. *United States*, 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879, reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949).

On appeal, we analyze a trial court's determination of the existence of probable cause, in the context of a warrantless search or seizure, in the same manner that we analyze a trial court's determination of the existence of the reasonable belief necessary to conduct a patdown search. "[W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in

the facts set out in the [court's] decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the . . . decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *In re Ralph M.*, 211 Conn. 289, 316, 559 A.2d 179 (1989); see *State* v. *Zindros*, supra, 189 Conn. 238. Because a trial court's determination of the existence of probable cause implicates a constitutional claim, we must "review the record carefully to ensure that its determination was supported by substantial evidence." *State* v. *Greenfield*, supra, 228 Conn. 68–69.

The trial court concluded that Pagan had probable cause to believe that the defendant possessed narcotics before he reached into the defendant's pocket and seized the cocaine. The trial court based this conclusion on Pagan's immediate belief that he felt rock cocaine in the defendant's pocket while conducting a lawful patdown search for weapons, and on the defendant's presence at a private residence that a magistrate had found probable cause to believe was the site of cocaine trafficking. We agree with the trial court that, in light of these factual predicates, Pagan validly seized the cocaine from the defendant's pocket because, at that time, Pagan had probable cause to arrest the defendant for possession of narcotics. As a result, Pagan properly seized the cocaine during a search incident to a lawful arrest.

The trial court expressly found that "Pagan immediately concluded that what he felt was contraband drugs" and that the object in the defendant's pocket "could be felt and recognized as contraband by an experienced narcotics officer by an open, flat-handed pat [of] the jeans pocket." These findings are not clearly erroneous.[17] The trial court found credible Pagan's testimony

---

[17] The defendant claims that Pagan formed his belief that the defendant possessed cocaine not as the result of a valid patdown search, but as the

that, upon feeling the object in the defendant's pocket, he immediately believed it to be rock cocaine.[18] Pagan's

result of an impermissible exploration of the defendant's pocket. We have already concluded that the trial court properly found, to the contrary, that Pagan did not exceed the permissible scope of a lawful patdown search. See part I of this opinion.

[18] At the hearing on the defendant's motion to suppress, Pagan testified as follows on direct examination:

"A. I instructed the subject to put his hands on his head and not to move. I told him he was not under arrest, and I conducted a patdown search of his person for weapons . . . . In conducting the patdown in the area of the right, front pants pocket, I detected an object that was somewhat hard, and I heard the sound of plastic, which was familiar to me, and based on my training and experience it is known that narcotics traffickers often package cocaine in plastic bags. I believed this was a plastic bag containing cocaine. . . .

"Q. When you felt that—could you describe, at first, what you thought of its approximate size?

"A. Several inches in length, and one or two inches, at the most, in width.

"Q. And you said it was hard?

"A. Yes.

"Q. Okay. And as you were—Aside from the size and the hardness of it, did you mention feeling—hearing the sound of plastic? Is that right?

"A. That's correct.

"Q. And is—Why was that significant to you?

"A. I believed it to be a package of cocaine. Plastic bags are very common items of packaging materials used by persons engaged in drug trafficking.

"Q. Aside from the size and shape and sound of the plastic, did you feel anything as you moved your hands in the patdown?

"A. Just the hardness of the object and the sound of plastic.

"Q. At what point in time did you realize that it was not a weapon?

"A. Instantaneously upon touch, I believed it to be a package—

"Q. Instantaneously upon touch, you believed it was not a weapon?

"A. That's correct."

Pagan testified as follows on cross-examination:

"A. Once [the defendant] was handcuffed, I placed my left hand on his middle back area and with my right hand from the top of his body down the entire right side of his body. When I got to the front pants pocket, almost instantaneously upon touch, I felt that hard object and I heard the sound of plastic, and I believed it to be a bag of cocaine. At which point, I continued with the patdown search, going over to the left-hand side of his body with my left hand.

"Q. How do you do a patdown?

"A. With my hands.

"Q. And what do your hands do?

"A. They touch in an open-handed manner. Like this (indicating), and with the five fingers extended, you would pat the surfaces of the body.

belief did not arise in a factual vacuum. Rather, he relied on his fifteen years of experience as a police officer, and his most recent experience, during the past three years, in drug enforcement.[19] That experience informed him how narcotics are stored and taught him how, during a patdown search, to recognize the feel of packaged narcotics.

Moreover, the trial court's personal observations buttressed its factual findings. The trial court had before it the cocaine that Pagan had seized from the defendant and a plastic bag similar to the one in which Pagan had found the cocaine. The trial court also observed the defendant wearing the same jeans that he had worn when Pagan had searched him. We conclude that the trial court properly found, both on the basis of its assessment of the physical evidence and Pagan's testimony, that Pagan had immediately and reasonably believed that the object he had felt in the defendant's pocket was rock cocaine.[20]

---

"Q. You pat?

"A. Correct.

"Q. You didn't just reach in and grab what you could out of the front pocket?

"A. No, I did not.

"Q. You knew immediately, what you felt was not a weapon?

"A. Yes, sir.

"Q. And you didn't suspect it was narcotics, did you, until you determined it was plastic?

"A. It was almost—I would say it was an instantaneous decision on my part, based on the touch, that I felt it was an item of packaging material containing narcotics."

[19] Pagan testified that he had served as a member of the Connecticut state police for approximately fifteen years, the last three years of which he had served at the rank of sergeant in charge of the eastern division of the statewide narcotics task force. He also testified that he had previously served on the statewide narcotics task force for approximately two years as an investigator and an undercover officer. He did not testify as to the capacity that he had served in the other ten years that he had been a police officer.

[20] In the absence of such a finding, because Pagan found no weapon during the patdown search, he would have had no authority to conduct a further search without a warrant. See part I of this opinion.

Substantial evidence therefore supports the trial court's legal conclusion that probable cause existed before Pagan searched the defendant's pocket and seized the cocaine. As we have already determined, Pagan immediately and reasonably believed that the object in the defendant's pocket was rock cocaine. Furthermore, Pagan detained and patted down the defendant at a private residence that, according to the probable cause finding by a neutral magistrate, was the site of cocaine trafficking. "When a magistrate has determined that a residence is the probable site of drug trafficking, the occupants of that residence are very likely to be involved in drug trafficking . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Guy*, 172 Wis. 2d 86, 98, 492 N.W.2d 311 (1992), cert. denied, 509 U.S. 914, 113 S. Ct. 3020, 125 L. Ed. 2d 709 (1993); *People* v. *Thurman*, 209 Cal. App. 3d 817, 824, 257 Cal. Rptr. 517, review denied, 1989 Cal. LEXIS 3234 (July 13, 1989); *State* v. *Peguero*, 652 A.2d 972, 974 (R.I. 1995). We are persuaded that the trial court properly concluded that, under these circumstances, Pagan had probable cause to believe that the defendant illegally possessed narcotics in violation of General Statutes § 21a-279 (a),[21] a felony.

Once Pagan had probable cause to believe that the defendant was committing a felony in his presence, he had authority to arrest the defendant without a warrant. General Statutes § 54-1f (b).[22] Pagan was not required

[21] General Statutes § 21a-279 provides in relevant part: "Penalty for illegal possession. Alternative sentences. (a) Any person who possesses or has under his control any quantity of any narcotic substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than seven years or be fined not more than fifty thousand dollars, or be both fined and imprisoned; and for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[22] See footnote 16.

to turn a blind eye to what he had probable cause to believe was a crime being committed in his presence, and thus ignore his duty as a police officer, because the information that had created probable cause had been obtained tactilely during a lawful patdown search. Cf. *Michigan* v. *Long*, 463 U.S. 1032, 1050, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). The defendant does not claim that, if his arrest was, as we have concluded, supported by probable cause, the search of his pocket and the seizure of the cocaine were not sufficiently contemporaneous with his arrest so as to qualify as an integral part thereof. See *State* v. *Federici*, supra, 179 Conn. 54–55; *State* v. *Cobuzzi*, supra, 161 Conn. 378–79.

The trial court's conclusion that Pagan had probable cause to arrest the defendant is legally and logically consistent with the facts found and is supported by substantial evidence. Accordingly, the trial court properly denied the defendant's motion to suppress.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of the trial court.

In this opinion CALLAHAN and BORDEN, Js., concurred.

BERDON, J., with whom KATZ, J., joins, dissenting. The *Terry* patdown,[1] unknown to the common law,[2] is

---

[1] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The *Terry* patdown is sometimes referred to as the *Terry* frisk.

[2] In his concurrence in *Minnesota* v. *Dickerson*, 508 U.S. 366, 380–81, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), Justice Scalia noted that the constitutional basis for a *Terry* patdown cannot be found in the common law: "I am not entirely sure that the physical search—the 'frisk'—that produced the evidence at issue here complied with that constitutional standard. . . .

"There is good evidence, I think, that the 'stop' portion of the *Terry* 'stop-and-frisk' holding accords with the common law—that it had long been considered reasonable to detain suspicious persons for the purpose of demanding that they give an account of themselves. . . .

tolerated for the sole purpose of protecting our police officers in the performance of their investigatory duties from serious injury as a result of concealed weapons. *State* v. *Williams*, 157 Conn. 114, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969) (*Terry* patdown is permissible under state constitution); see *Adams* v. *Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972) ("purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence"). It is a harrowing and humiliating experience[3] that severely infringes on a person's right of privacy and must be circumscribed in view of its sole purpose. Therefore, once a police officer has determined that an individual does not possess a weapon, the search is over and there is no authority for further intrusion. *Ybarra* v. *Illinois*, 444 U.S. 85, 92–94, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979); *Sibron* v. *New York*, 392 U.S. 40, 65–66, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968).

Today, the majority expands the *Terry* search, by validating a "plain touch" exception for nonthreatening

"I am unaware, however, of any precedent for a physical search of a person thus temporarily detained for questioning. . . .

"I frankly doubt, moreover, whether the fiercely proud men who adopted our Fourth Amendment would have allowed themselves to be subjected, on mere *suspicion* of being armed and dangerous, to such indignity . . . ." (Citations omitted; emphasis in original.)

[3] In describing the invasiveness and the indignity of a *Terry* patdown, Justice Scalia, in his concurring opinion in *Minnesota* v. *Dickerson*, 508 U.S. 381–82, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), quoted from a standard police manual recommending that the following procedure be used: " 'Check the subject's neck and collar. A check should be made under the subject's arm. Next a check should be made of the upper back. The lower back should also be checked.

" 'A check should be made of the upper part of the man's chest and the lower region around the stomach. The belt, a favorite concealment spot, should be checked. The *inside thigh and crotch area* also should be searched. The legs should be checked for possible weapons. The last items to be checked are the shoes and cuffs of the subject.' J. Moynahan, Police Searching Procedures 7 (1963) . . . ." (Emphasis added.)

contraband. In my view, this plain touch exception constitutes an unreasonable search and seizure under our state constitution thereby unconstitutionally infringing on the right of privacy, which is so sacred to our freedom.

The majority, without any independent analysis of the reliability of "plain touch," its reasonableness or its effects upon the privacy rights of our citizens, adopts the holding of *Minnesota* v. *Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), when construing the constitution of Connecticut, article first, § 7. "Although we have often relied upon decisions of the United States Supreme Court interpreting the fourth amendment to define the protections provided by related provisions of our state constitution, we have at times determined that the state constitution affords greater protections to the citizens of Connecticut than does the federal constitution, as interpreted by the United States Supreme Court." *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992) ("seizure" was defined more expansively under state constitution than in *California* v. *Hodari*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 [1991]); *State* v. *Joyce*, 229 Conn. 10, 23, 639 A.2d 1007 (1994) (under state constitution individuals have reasonable expectation of privacy in their clothing); *State* v. *Miller*, 227 Conn. 363, 630 A.2d 1315 (1993) (holding that warrantless searches of impounded automobiles violate Connecticut constitution, despite United States Supreme Court holding in *Chambers* v. *Maroney*, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 [1970]); *State* v. *Geisler*, 222 Conn. 672, 695, 610 A.2d 1225 (1992) (evidence derived from unlawful warrantless entry into home must be excluded unless taint of illegal entry is attenuated by passage of time or intervening circumstance, despite *New York* v. *Harris*, 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 [1990]); *State* v. *Marsala*, 216 Conn. 150, 151, 579 A.2d 58 (1990)

(rejecting under state constitution good faith exception to exclusionary rule adopted in *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 [1984]). "We have stated, moreover, that the Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens. . . . Thus, the law of the land may not, in the state constitutional context, also be the law of the state of Connecticut." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo,* supra, 649.

My analysis of whether the state constitution allows this further intrusion into the privacy rights of our citizens begins with the requirements for an investigatory stop under *Terry* that could trigger a patdown. A police officer needs only a "reasonable and articulable suspicion" that an individual is engaged in criminal activity in order to justify a *Terry* stop. *State* v. *Gant,* 231 Conn. 43, 65, 646 A.2d 835 (1994), cert. denied,     U.S.    , 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995). Simply because a *Terry* stop is permitted, however, does not necessarily mean that there is a justification for a patdown. Before an individual may be patted down, which is far more intrusive of a person's privacy,[4] the officer must also have a reasonable belief that the individual is armed and dangerous. *Minnesota* v. *Dickerson,* supra, 508 U.S. 373. For the purposes of this dissent, I assume that both of these requirements have been met.[5]

---

[4] See footnotes 2 and 3.

[5] In this case, the defendant, who was on the premises when the search warrant was executed, was unknown to the police. Other than the fact that he was present, there is nothing in the record that would have justified the police to be suspicious of him. Indeed, when the police entered, they demanded that the defendant put his hands on his head and lie face down on the floor. He immediately complied. The defendant was then handcuffed by the police. Subsequently, while lying face down with his hands handcuffed behind his back, the defendant was subjected to a *Terry* patdown. It is well established that "[a]n individual may [not] be frisked based upon nothing

Extending the *Terry* patdown under the state constitution to allow a police officer's "plain touch" to form the basis for probable cause to conduct a full blown search and seizure is easily subject to abuse. The impact of this extension will fall the hardest on the poor, underprivileged and minority members of our society who are economically compelled to live in neighborhoods that are infested with crime and drugs. It is in this setting that police are more apt to claim a fear of weapons in order to engage in a *Terry* patdown when their true motivation is to search for contraband. "The 'plain touch' doctrine will encourage officers to investigate any lump or bulge in a person's clothing or pockets that arouses their curiosity during the course of a patdown search. If the item turns out to be contraband, then its seizure can be retrospectively justified. If it turns out to be something else, then there is no case and the matter ends there. In the interim, a citizen is subject to an unwarranted intrusion into his personal privacy far beyond the intrusion contemplated by the weapons patdown search." *People* v. *Mitchell*, 165 Ill. 2d 211, 650 N.E.2d 1014, 1025 (1995) (Heiple, J., dissenting); see

more than an unfortunate choice of associates." *United States* v. *Bell*, 762 F.2d 495, 499 (6th Cir. 1985). All the *Terry* requirements must be satisfied "even though [a] person happens to be on premises where an authorized narcotics search is taking place." *Ybarra* v. *Illinois*, supra, 444 U.S. 94; see *State* v. *Coons*, 627 A.2d 1064 (N.H. 1993) (as a threshold matter, police officer must reasonably believe person to be frisked is armed and dangerous). In order to justify the patdown of the defendant, the majority depends solely on the application for the search warrant, which indicated, in boilerplate language, that there may be weapons at the location to be searched. The application alleged that "based on [the general training and experience of the police officers] . . . [f]irearms that are to be seized are commonly possessed and used by the drug dealer for the intimidation of *his* customers to collect payment for their drug debts and protection from theft of *his* drugs and monies by competitors." (Emphasis added.) The boilerplate nature of this assertion is apparent given the fact that the person to be searched under the warrant was a woman, not a man. Under the circumstances of this case, therefore, it is not evident whether a reasonably prudent person could be warranted in believing that the officers were in danger. *Terry* v. *Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

*State* v. *Miller*, supra, 227 Conn. 370 (similarly, because no evidence flowed from *Terry* stop, court had no cause to determine whether stop was constitutional, thereby ignoring possible invasion into individual's privacy).

Both the United States Supreme Court's analysis in *Dickerson* and the majority's analysis in this case hinge on a flawed premise: contraband may possess distinctive "tactile characteristics." It does not take much experience, either on the part of a police officer or a judge, to be able to determine accurately the existence of a gun, knife, billy club or other weapon by the sense of touch. This is because weapons possess distinctive physical characteristics that lend themselves to being identified by touch.[6] Contraband, such as drugs, however, does not possess such distinguishing tactile characteristics. Contraband takes the form of the container in which it is kept. Unless an individual is clairvoyant, the contents of a package cannot be determined from merely touching the container.

For example, in a similar case recently before the Court of Appeals of Michigan, a police officer, while conducting a *Terry* patdown, "felt a pill bottle in [the] defendant's groin. He claimed that he recognized this as a method by which cocaine was transported. However, in order to make the determination that this particular pill bottle contained cocaine, he had to remove it from [the] defendant's person and visually inspect it." *People* v. *Champion*, 205 Mich. App. 623, 631, 518 N.W.2d 518 (1994). The court held that the contraband should have been suppressed at trial because "it [is] impossible to conclude that the incriminating nature of a pill bottle is immediately apparent. . . . Merely from feeling the contours of a pill bottle, the officer was able

---

[6] There may be certain weapons that do not possess such distinctive tactile characteristics, but we indulge in this belief nonetheless because of the possible danger to the police officer.

to conclude that [the] defendant carried a pill bottle, not that he carried contraband." Id., 631–32.

Similarly, in this case, Sergeant Lawrence Pagan of the Connecticut state police concluded that the defendant was not armed[7] but felt "a hard object" and heard "a sound made by plastic." From this information alone, the trial court concluded that the object's "incriminating character [was] 'immediately apparent.' " *Horton* v. *California*, 496 U.S. 128, 136, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990); *State* v. *Reddick*, 207 Conn. 323, 335, 541 A.2d 1209 (1988). Such a conclusion is speculative and defies logic. Dozens of items, such as a Tootsie Roll, a Snickers bar or cough drops, possess the two characteristics described by Pagan. Indeed, one commentator analogized the "plain feel" exception to a fourth amendment rendition of "the princess and the pea."[8] Consequently, the officer's patdown could not have given him probable cause to arrest the defendant and engage in a search of his person.

The Supreme Court of the United States in *Minnesota* v. *Dickerson*, supra, 508 U.S. 366, depended heavily on an analogy between plain view and plain touch. Such an analogy is flawed. "The plain view doctrine, it must be emphasized, establishes an exception to the requirement of a warrant not to *search* for an item, but to *seize* it. Because [an] item is already in the open where it may be seen, the owner can have no expectation of privacy in its concealment and, thus, its viewing cannot be a search under [either the federal or state constitu-

---

[7] If, of course, during the patdown, a gun is found, this may very well furnish a police officer with probable cause to arrest. See, e.g., General Statutes § 53-206 (permit required to carry dangerous weapons). This, of course, would trigger the right to a full search incident to a lawful arrest. *State* v. *Waller*, 223 Conn. 283, 292, 612 A.2d 1189 (1992). For all practical purposes, the "plain touch" doctrine that the majority embraces arises only in a situation, such as this case, where no weapon is found on the defendant.

[8] Note, "The 'Plain Feel' Exception—A Fourth Amendment Rendition of the Princess and the Pea: *State* v. *Dickerson*," 62 U. Cin. L. Rev. 321 (1993).

tion] . . . . The theory underlying the justification for the plain view exception cannot logically be extended to concealed items which are discoverable only through touch. . . . Unlike the item in plain view in which the owner has no privacy expectation, the owner of an item concealed by clothing or other covering retains a legitimate expectation that the item's existence and characteristics will remain private. . . . For, even if the intrusion inherent in the initial act of touching is entirely authorized, the discovery and seizure of the items will entail a further intrusion." (Citations omitted; emphasis in original.) *People* v. *Diaz*, 81 N.Y.2d 106, 110–11, 612 N.E.2d 298, 595 N.Y.S.2d 940 (1993).

"Indeed, the very concept of 'plain touch' is a contradiction in terms: the idea of plainness cannot logically be associated with information concerning a concealed item which is available only through the sensory perceptions of someone who touches it. . . . While in most instances seeing an object will instantly reveal its identity and nature, touching is inherently less reliable and cannot conclusively establish an object's identity or criminal nature . . . ." (Citations omitted.) Id., 112. Moreover, unlike "plain touch," the "plain view" doctrine does not provide law enforcement officers with an incentive to subject an individual to a *Terry* patdown.

Furthermore, the very issue before us today was addressed twenty-five years ago by the Connecticut Circuit Court. In *State* v. *Anonymous 1971–20*, 6 Conn. Cir. Ct. 583, 587–88, 280 A.2d 816 (1971), Judge David Jacobs wrote: "Where, as in the case at bar, the officer does not feel an object which seems to be a weapon, but feels a package which he believes might be evidence of some crime, such as the possession of narcotics, the question arises whether he must terminate his search or whether he may reach into the person's pocket and bare whatever it holds. 'The sole justification of the search in the present situation is the protection of the

police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.' *Terry* v. *Ohio*, [392 U.S. 1, 29, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]. In other words, an extended search, exceeding the purpose of the frisk, would be constitutionally unreasonable, and any evidence thereby obtained must be excluded. 'Such a search violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents.' *Sibron* v. *New York*, [supra, 392 U.S. 65]."

I agree with both Judge Jacobs and the Appellate Court. "[T]he sense of touch is far more unreliable and touching [is] far more intrusive into the right of personal privacy expected by our citizens and [consequently] the concept of [plain touch] fails to comport with the mandate of article first, § 7, of the Connecticut constitution." *State* v. *Trine*, 37 Conn. App. 561, 572, 657 A.2d 675 (1995).

Accordingly, I dissent.